**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**CATFISH FARMERS OF AMERICA, *et al.*,**

          **Plaintiffs,**

          **v.**

**UNITED STATES,**

          **Defendant.**

**Before:  Hon. Jane A. Restani,**
               **Senior Judge**

**Court No. 24-00126**

## ORDER

Upon consideration of the motion for summary judgement and memorandum in support filed by Plaintiffs Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, "CFA")  and all other papers and proceedings herein, it is hereby

**ORDERED**, that the final results issued by the U.S. Department of Commerce ("Commerce") in the new shipper review of the antidumping duty order on certain frozen fish fillets from the Socialist Republic of Vietnam concerning Co May Import-Export Company Limited ("Co May") are remanded for further consideration; and it is further

**ORDERED**, that Commerce on remand shall reconsider its treatment of Co May's single U.S. sale as *bona fide*.

Ct. No. 24-00126

**SO ORDERED.**

Dated: _____, 2024          _____
         New York, N.Y.                                    Hon. Jane A. Restani, Senior Judge

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| |
|---|
| **CATFISH FARMERS OF AMERICA**, *et al.*, |
| **Plaintiffs,** |
| **v.** |
| **UNITED STATES,** |
| **Defendant.** |

Before:  Hon. Jane A. Restani,
Senior Judge

Court No. 24-00126

<u>**RULE 56.2 MOTION FOR JUDGEMENT ON THE AGENCY RECORD OF PLAINTIFFS CATFISH FARMERS OF AMERICA, *ET AL*.**</u>

Pursuant to Rule. 56.2 of the Rules of the United States Court of International Trade ("CIT"), Plaintiffs Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, "CFA") move for judgment on the agency record regarding the final results of the new shipper review of the antidumping duty order on certain Vietnamese frozen fish fillets concerning Co May Import-Export Company Limited ("Co May"), as published in *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 89 Fed. Reg. 53,043 (Dep't Commerce June 25, 2024) (final results of antidumping duty new shipper rev.; 2022-2023).

Ct. No. 24-00126

Specifically, CFA respectfully moves that this Court remand the final results to the U.S. Department of Commerce for reconsideration and other action in accordance with the instructions in the accompanying proposed order. The arguments justifying CFA's motion are set forth in the accompanying opening brief.

Respectfully submitted,

*/s/ Nazak Nikakhtar*
Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

*Counsel to the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc.*

Dated: December 16, 2024

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

CATFISH FARMERS OF AMERICA, *et al.*,

 Plaintiffs,

 v.

UNITED STATES,

 Defendant.

Before:  Hon. Jane A. Restani,
 Senior Judge

Court No. 24-00126

<u>**NON-CONFIDENTIAL VERSION**</u>

**Business Proprietary Information
Removed from Pages: 4-26**

<u>OPENING BRIEF OF PLAINTIFFS, CATFISH FARMERS OF AMERICA, *et al.*</u>

**Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.**

**WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202) 719-7000**

*Counsel to the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc.*

**December 16, 2024**

Ct. No. 24-00126                                    NON-CONFIDENTIAL VERSION

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................ 1

II.    RULE 56.2 STATEMENT ................................................................... 1

    A.    The Administrative Determination Under Review ................................ 1

    B.    Issues Presented for Review ................................................................. 1

    C.    Request for Court Order and Relief Sought ......................................... 2

III.    BACKGROUND ................................................................................. 2

IV.    STANDARD OF REVIEW ............................................................... 10

V.    SUMMARY OF ARGUMENT ......................................................... 11

VI.    ARGUMENT ..................................................................................... 13

    A.    Commerce Did Not Adequately Explain or Support Its Conclusion Regarding the Typicality of Co May's Price ........................ 15

    B.    Commerce Did Not Adequately Explain or Support Its Conclusion Regarding the Profitability of Resales ................................ 18

        1.    Commerce Did not Adequately Explain or Support Its Treatment of Antidumping Duty Deposits .............................. 20

        2.    Commerce Did not Adequately Explain or Support Its Conclusions Regarding SG&A Expenses ................................ 21

        3.    Conclusion Regarding Resale Profitability ............................ 22

    C.    Commerce Did Not Adequately Explain or Support Its Conclusion Regarding the Relationship between Co May's Customer and the Resale Customers ......................................................... 23

VII.    CONCLUSION .................................................................................. 26

Ct. No. 24-00126                                        NON-CONFIDENTIAL VERSION

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Asociacion Colombiana Exportadores de Flores v. United States,*
    23 CIT 148, 40 F. Supp. 2d 466 (1999) ...............................................................17

*Huzhou Muyun Wood Co. v. United States,*
    279 F. Supp. 3d 1215 (Ct. Int'l Trade 2017) ......................................................13

*Loper Bright Enters. v. Raimondo,*
    144 S. Ct. 2244 (2024) ........................................................................................11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...............................................................................................11

*Suramerica de Aleaciones Laminadas, C.A. v. United States,*
    44 F. 3d 978 (Fed. Cir. 1994) .............................................................................11

*Tianjin Tiancheng Pharm. Co. v. United States,*
    29 CIT 256, 366 F. Supp. 2d 1246 (2005) ...........................................13, 14, 17, 20

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i) ......................................................................................10

19 U.S.C. § 1675(a)(2)(B)(i) ..........................................................................................2

19 U.S.C. § 1675(a)(2)(B)(iv) ....................................................................2, 3, 13, 23

19 U.S.C. § 1675(a)(2)(B)(iv)(I) .................................................................................15

19 U.S.C. § 1675(a)(2)(B)(iv)(V) ...............................................................................18

**Other Authorities**

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam,*
    89 Fed. Reg. 53,043 (Dep't Commerce June 25, 2024) .................................1, 3, 5

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam,*
    89 Fed. Reg. 5,862 (Dep't Commerce Jan. 30, 2024) ...........................................3

*Certain Frozen Fish Fillets from the Socialist Republic of Vietnam,*
    87 Fed. Reg. 55,996 (Dep't Commerce Sept. 13, 2022) ........................................5

Ct. No. 24-00126                                                    NON-CONFIDENTIAL VERSION

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam,*
    86 Fed. Reg. 36,102 (Dep't Commerce July 8, 2021) ....................................................5

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam,*
    83 Fed. Reg. 23,756 (Dep't Commerce Apr. 29, 2020)..................................................5

*Honey from the People's Republic of China,*
    71 Fed. Reg. 58,579 (Dep't Commerce Oct. 4, 2006) ....................................................3

*Circular Welded Non-Alloy Steel Pipe from the Republic of Korea,*
    80 Fed. Reg. 32,937 (Dep't Commerce June 10, 2015) ..................................................4

*Mattresses from the People's Republic of China,*
    86 Fed. Reg. 11,924 (Dep't Commerce Mar. 1, 2021) ..................................................2

*Xanthan Gum from the People's Republic of China,*
    81 Fed. Reg. 56,856 (Dep't Commerce Aug. 22, 2016)..................................................9

**Suspects**

H. Rept. 114-114, Part I (May 14, 2015) ..................................................................2, 13

## I.    <u>INTRODUCTION</u>

On behalf of Plaintiffs Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, "CFA"), we respectfully submit this brief in support of CFA's motion for judgment on the agency record.

## II.    <u>RULE 56.2 STATEMENT</u>

### A.    <u>The Administrative Determination Under Review</u>

The administrative determination under appeal is a new shipper review of the antidumping duty order on certain frozen fish fillets from the Socialist Republic of Vietnam ("Vietnam"). The final results were issued on June 14, 2024 and were published in the *Federal Register* on June 25, 2024. *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 89 Fed. Reg. 53,043 (Dep't Commerce June 25, 2024) (final results of antidumping duty new shipper rev.; 2022-2023) ("Final Results"), P.R. 216, and accompanying Issues and Decision Memorandum ("IDM"), P.R. 211.

### B.    <u>Issues Presented for Review</u>

This appeal raises the following issue:

(1)    Whether the U.S. Department of Commerce ("Commerce") erred in treating the single sale made by Vietnamese exporter Co May Import-Export Company Limited ("Co May") as *bona fide* for purposes of the new shipper review, where the record showed that

    a.      the sale was unreflective of normal commercial practices and likely future sales,

    b.      Co May's goods were not resold by the U.S. customer for a profit,

and where Commerce did not adequately explain or support treatment of Co May's sale as *bona fide*.

### C.    Request for Court Order and Relief Sought

CFA respectfully requests that the Court remand the challenged agency action for further consideration regarding the issue identified in Subsection B above.

## III.    BACKGROUND

This appeal arises from a new shipper review involving the antidumping duty order on Vietnamese frozen catfish (*i.e., pangasius*) fillets. Where a foreign producer did not export goods of the type subject to an antidumping duty order during the original investigation period, the producer may request a "new shipper review" to obtain an individual dumping margin. 19 U.S.C. § 1675(a)(2)(B)(i). New shipper reviews may only be conducted based on *bona fide* sales to the United States during the period covered by each review. *Id.* § 1675(a)(2)(B)(iv).

Congress added the *bona fide* sales requirement to the trade law statute over concerns that foreign companies might otherwise abuse the new shipper review process by "enter{ing} into a scheme to structure a few sales to show little or no dumping." H. Rept. 114-114, Part I (May 14, 2015) at 89. As Commerce has explained, the *bona fide* requirement "ensure{s} that a respondent does not unfairly benefit from an atypical sale and obtain a lower dumping margin than the respondent's usual commercial practice would dictate." *See, e.g.*, Preliminary Decision Memorandum accompanying *Mattresses from the People's Republic of China*, 86 Fed. Reg. 11,924 (Dep't Commerce Mar. 1, 2021) (prelim. intent to rescind the 2020 antidumping duty new shipper

rev.) at 3 ("*Mattresses from China* PDM"). In determining whether the sales underlying a new shipper review are *bona fide*, the statute directs Commerce to consider the circumstances surrounding the sales, such as:

- the sales' prices,

- whether the sales were made in commercial quantities,

- the sales' timing,

- the expenses arising from the sales,

- whether the goods were resold at a profit in the United States,

- whether the sales were made on an arms-length basis, and

- any other factor determined relevant as to whether the sales are likely to be typical of those that the new shipper will make after the review.

19 U.S.C. § 1675(a)(2)(B)(iv). Commerce has further highlighted that, in new shipper reviews that are premised on a single sale, "it is essential that every aspect of that sale indicate that the transaction is reflective of normal commercial realities." Issues and Decision Memorandum accompanying *Honey from the People's Republic of China*, 71 Fed. Reg. 58,579 (Dep't Commerce Oct. 4, 2006) (rescission and final results of antidumping duty new shipper rev.) at 3 ("*Honey from China* IDM").

On March 23, 2023, Commerce initiated a new shipper review at Co May's request. *See, e.g.*, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 89 Fed. Reg. 5,862 (Dep't Commerce Jan. 30, 2024) (prelim. results of new shipper rev.; 2022-2023), P.R. 185. Co May reported making a single sale to the U.S. market during the five-month period covered by the review, August 1, 2022 – January 31, 2023. *See* Letter from Mayer Brown LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from Vietnam: Section C Questionnaire Response – Co*

**Ct. No. 24-00126**                                                    NON-CONFIDENTIAL VERSION

*May Import Export Company Limited* (May 5, 2023) C.R. 21-25, P.R. 24-26, at 39. That sale was made at a [                                    ] than Co May's non-U.S. sales of frozen *pangasius* fillets during the review period. *See* Letter from Mayer Brown LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from Vietnam: Request for New Shipper Review – Co May Import Export Company Limited* (Feb. 14, 2023), C.R. 1, P.R. 1, at Exhibit 6 ("NSR Request"). While the U.S. sale was priced at $[      ]/kg, Co May's overall sales during the review period had an average value of [      ]/kg. *See id.* The U.S. price was also [                    ] of the prices that Co May charged for similar quantities of goods sold to [                        ] during the review period, and/or to countries with levels of economic development similar to that of the United States. ([                        ]). *Id.*; *see also* Mem. to All Interested Parties, re: *Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information* (June 23, 2023), P.R. 54, at Attachment 1 ("SC Memo"). Indeed, Co May's U.S. price [        ] than its price for frozen catfish fillets sold [                ] over the period. NSR Request at Exhibit 6.

 Co May's price [                ] than the average price that the mandatory respondents in the 2021-2022 annual administrative review – which was being conducted simultaneously with the new shipper review – charged for goods of the same CONNUM.[1] *See* Mem. to the File from

---

[1] "CONNUM" is a shorthand for "control number," a reference to the product-characteristic coding system that Commerce establishes at the outset of an antidumping duty investigation. *See, e.g.*, Issues and Decision Memorandum accompanying *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 80 Fed. Reg. 32,937 (Dep't Commerce June 10, 2015) (final results of antidumping duty admin. rev.; 2012-2013) at 27 (briefly explaining the CONNUM concept).

 Co May and the mandatory respondents in the 2021-2022 review followed the same general CONNUM system when reporting sales but assigned different code values to certain product characteristics. IDM at 9 n.44. Nonetheless, Commerce was able to identify the mandatory respondents' sales during the 2021-2022 review of goods with the characteristics of the product that Co May sold during the new shipper review period. *Id.* at 9; *see also* Mem. to the File from

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

**Ct. No. 24-00126**                                          NON-CONFIDENTIAL VERSION

Javier Barrentos, re: *Placement of U.S. Sales Data on the Record* (Oct. 6, 2023), C.R. 371-372, P.R. 157, at 1 and Attachment 1 (Native Excel Files) ("2021-2022 Sales Data"). These two companies, Vinh Hoan Corporation ("VHC") and Can Tho Import Export Seafood Joint Stock Company ("CASEAMEX"), collectively sold [           ] kgs of the relevant CONNUM to the U.S. market during 2021-2022 administrative review period for $[           ], or at an average unit price of $[    ]/kg. *See* Preliminary Analysis Memo at Attachment 3.

Too, Co May's U.S. customer was required to deposit the Vietnam-wide entity rate of $2.39/kg on Co May's goods at entry. *See, e.g.*, *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 87 Fed. Reg. 55,996 (Dep't Commerce Sept. 13, 2022) (final results of antidumping duty admin. rev. final deter. of no shipments; 2020-2021) ("2020-2021 FR Notice") (noting that the Vietnam-wide entity rate as of September 13, 2022 was $2.39/kg); *see also* NSR Request at Exhibit 3. As such, the antidumping duty-inclusive price paid by Co May's customer was $[    ]/kg ($[    ] + $2.39). This is [           ] the antidumping duty-inclusive U.S. price of equivalent-CONNUM goods shipped by VHC and CASEAMEX during the 2021-2022 review period. *See* 2021-2022 Sales Data at 2 and Attachment 1 (Native Excel Files) ("2021-2022 Sales Data"). Specifically, the weighted average antidumping duty-inclusive price of such goods was $[    ]/kg.[2] *Id.*

---

Javier Barrientos, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Preliminary Results Analysis Memorandum for Co May Import-Export Company Limited* (Jan. 17, 2024), C.R. 374, P.R. 182, at 1-2 ("Preliminary Analysis Memo").

[2]     A 0% deposit rate was established for VHC in the 2018-2019 review of the order, while a $0.15/kg deposit rate was established for CASEAMEX in the final results of the 2017-2018 review. Both rates remained in effect through the end of the 2021-2022 review period. *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 86 Fed. Reg. 36,102, 36,103 (Dep't Commerce July 8, 2021) (final results of antidumping duty admin. rev. and final deter. of no shipments; 2018-2019); *Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 83 Fed. Reg. 23,756, 23,757 (Dep't Commerce Apr. 29, 2020) (final results of antidumping duty admin. rev. and final

Ct. No. 24-00126                                    NON-CONFIDENTIAL VERSION

Co May's U.S. customer, [                          ] was also unable to resell Co May's

goods at a price that captured both the base price and the antidumping duties charged at import, to

say nothing of other costs incurred in procuring and reselling the goods. [       ] paid Co May a

price of [           ] for the [                ] in subject merchandise, but also paid [              ] in

antidumping duties, and incurred a minimum of $[              ] in other expenses such as [

                               ], for a total of $[           ] or $[      ]/kg. NSR

Request at Exhibit 3 and Exhibit 4 (Commercial Invoice); Letter from Mayer Brown LLP to Sec'y

Commerce, re: *Certain Frozen Fish Fillets from Vietnam: Unaffiliated Customer Supplemental

Questionnaire* (Feb. 8, 2024), C.R. 380, P.R. 187, at Exhibit 1, Attachment A ("Customer SQR").

But the resale price of the goods was only $[          ], or $[      ]/kg – [          ] the base price

of $[     ]/kg paid to Co May, but [              ] either the $[      ]/kg antidumping duty-loaded

value of the goods or the (at least) $[      ]/kg that [      ] expended in acquiring and reselling

them. NSR Request at Exhibit 3; Customer SQR at Exhibit 1, Attachment A.

CFA uses the qualifier "at least" purposely, as the record indicates that [        ] failed to

report all expenses incurred in acquiring and reselling Co May's merchandise. [

                   ]. Customer SQR at Exhibit 1, Attachment A. Rather, it reported these and certain

other expenses as collectively equaling [                                        ], based

on what it claimed was its overall Selling, General, & Administrative (SG&A) expense ratio. *Id.*

at Exhibit 1, Attachment A, n.8-9 and 18; *see also* IDM at 6-7. The company, however, provided

no documentary support for its claim to have an [      ] SG&A ratio during the review period, or

---

deter. of no shipments; 2017-2018). The $[     ] figure was calculated based on duty-inclusive
value of [          ] for VHC and [      ]/kg for CASEAMEX.

Ct. No. 24-00126                                        NON-CONFIDENTIAL VERSION

for its implicit assertion that its estimate accurately reflected all [

] costs incurred with respect to Co May's goods. *See, e.g.*, Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Case Brief* (May 17, 2024), C.R. 405, P.R. 204, at 6-13 ("CFA's Case Brief"). Record evidence also indicated that [                                                                    ] given the [                                                                    ]. *See, e.g.*, Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Comments and Factual Information Regarding Co May's Supplemental Questionnaire Response* (Feb. 20, 2024), C.R. 381-383, P.R. 191, at Exhibits RFI-3A and RFI-4 ("Petitioners' Rebuttal").

The record also indicated that [      ] sold the product it obtained from Co May to [      ], despite having reported otherwise. *See, e.g.*, NSR Request at Exhibit 2; Customer SQR at Exhibit 1. Specifically, [      ] resold the merchandise to [                                          ]. Letter from Mayer Brown LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from Vietnam: Co May Import Export Company Limited – Supplemental Response* (Mar. 22, 2023), C.R. 3-6, P.R. 7, at 2 and Attachment 2. These [                                          ]. Petitioners' Rebuttal at Exhibit RFI-6. Further, [                    ], the [                        ] to which [      ] resold Co May's subject merchandise [                                ]. *Id.* This also happens to be [      ] mailing address. *Id.*

In its case brief, CFA argued that the record did not establish (1) that Co May's single U.S. sale was likely to be typical of those that Co May would make after the review, (2) that Co May's

7

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00126                                                    NON-CONFIDENTIAL VERSION

products were resold profitably in the United States, or (3) that [

]. CFA's Case Brief at 6-13. Commerce nonetheless treated Co May's single sale as *bona fide*. IDM at 4-11.

Regarding the typicality of the sale, the agency determined that while Co May charged [                    ] for frozen pangasius products sold to other markets during the review period, such differences were not indicative of atypicality, given that different markets may have different price points. *Id.* at 8-9. Commerce, however, did not acknowledge or address past cases in which it had specifically considered non-U.S. pricing in its *bona fide* analysis. *Id.* Commerce also concluded that the per-kilogram price of Co May's U.S. sale was in line with the prices charged by the mandatory respondents in the 2021-2022 annual administrative review of the order, and was thus commercially realistic. *Id.* at 4-5, 8-9. In this regard, Commerce observed that the mandatory respondents in the 2021-2022 review had hundreds of sales of the CONNUM of Co May's single U.S. sale, further confirming the commercial reasonableness and likely typicality of Co May's selling price. *Id.* at 9. Commerce did not, however, note that while [        ] hundreds of sales of an equivalent CONNUM in the 2021-2022 period, [                    ]. *Id.*; *see also* Preliminary Analysis Memo at Attachment 3.[3]  Accordingly, the mandatory respondents' weighted average duty-exclusive price for this CONNUM was $[    ]/kg, as compared with Co May's $[    ]/kg duty-exclusive price. Preliminary Analysis Memo at Attachment 3.

With respect to profitability, the agency found that it was improper to consider the antidumping duties that [        ] was required to deposit at the time of entry. IDM at 5. Commerce

---

[3]      Further, while [                                        ] 2021-2022 review period, [                              ] were all made [                        ] Co May's single U.S. sale. Preliminary Analysis Memo at Attachment 3.

Ct. No. 24-00126                                      NON-CONFIDENTIAL VERSION

reasoned that when calculating net prices for purposes of its antidumping duty calculations, it does not adjust for cash deposit rates. *Id.* In support, the agency cited a decision rescinding a new shipper review of the antidumping duty order on Chinese xanthan gum, in which the agency discussed its practice with respect to the role of cash deposit rates in calculating antidumping duty margins, but did not address the role of such deposits in determining the profitability of U.S. resales in the context of a *bona fide* analysis. *Id.* at 5 & n.16, citing Issues and Decision Memorandum accompanying *Xanthan Gum from the People's Republic of China*, 81 Fed. Reg. 56,856 (Dep't Commerce Aug. 22, 2016) (rescission of 2014-2015 antidumping duty new shipper rev.) at cmt 2 ("Xanthan Gum IDM"). Commerce also did not explain why it was appropriate to transpose its practice regarding the calculation of antidumping duty margins onto the threshold question of whether a sale is *bona fide*. IDM at 5. For that matter, the case that it cited indicated that the agency's standard practice was to include antidumping duties in its net price calculations when determining antidumping duty margins, rather than exclude them. Xanthan Gum IDM at cmt. 2.

With respect to the accuracy and completeness of [      ]'s reported expenses, and the impact of that reporting on the profitability analysis, Commerce found that there was no reason to believe that [      ] had not fully and accurately reported such expenses. IDM at 5-6. Commerce acknowledged that [      ] reported a single estimated SG&A figure that supposedly accounted for warehousing expenses and the cost of shipping Co May's goods to resale customers, but explained that it did not ask [      ] to supplement or support its reporting of SG&A expenses. *Id.* at 6-7. It accordingly concluded that the reporting was complete and accurate. *Id.* Commerce did not adequately explain or support these decisions, particularly given unaddressed record evidence indicating that [

]. *See* discussion *supra* 6-7.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00126                                    NON-CONFIDENTIAL VERSION

Finally, Commerce observed that while there was no apparent explanation for the fact that [      ] shared a mailing address with [                    ] resale customers, it resold Co May's merchandise to all resale customers for the same price. *Id.* at 7-8. And while CFA argued that [

                        ], Commerce found the evidence was mixed on this point. Commerce acknowledged that [

                        ]. *Id.* at 7. However, Commerce concluded that the record did not establish a connection between [                    ]. *Id.* In this regard, Commerce discounted certain information presented by CFA, in favor of weighing more heavily information sourced from [      ] website, which the agency characterized as consistent with a statement provided directly by [      ]. *Id.* But Commerce failed to recognize that the website did not contain any information regarding [      ]'s ownership or management, while also failing to acknowledge information submitted alongside the website printouts that identified [      ] as, at the very least, an [      ] employee. *Compare id.* at 7 & n.27 *with* Letter from Mayer Brown LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from Vietnam: Supplemental Section D Questionnaire Response – Part 2 (Questions 1, 23, 53, 57)* (Aug. 11, 2023) C.R. 209-369, P.R. 138-139, at Exhibit 1, Attachments B and D ("SDQR"). Commerce also failed to address CFA's argument that [

                        ]. *Id.* at 7-8.

## IV.    <u>STANDARD OF REVIEW</u>

This Court will "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is measured by the entire record, and Commerce "must take into account whatever in the record fairly detracts from its weight,"

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00126                                        NON-CONFIDENTIAL VERSION

including "contradictory evidence or evidence from which conflicting inferences could be drawn." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F. 3d 978, 985 (Fed. Cir. 1994). The agency fails to act consistently with the standard of review where it "offer{s} an explanation for its decision that runs counter to the evidence" or where it does not articulate a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Finally, agency determinations must comport with Congress's statutory directives. Even where the language of a statute is arguably ambiguous, it is the province of the courts to determine the "best" interpretation of the statute and to require that it be applied. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2265-66 (2024).

## V.    SUMMARY OF ARGUMENT

The Court should remand Commerce's treatment of Co May's sale as *bona fide* for further consideration.

In determining to treat the sale as *bona fide*, Commerce did not adequately explain or support its conclusion that the sale was likely to be typical of Co May's post-review sales. Commerce reasoned that while the sale was priced very differently than Co May's sales to other markets, other markets might have different price points, and Co May's price to its U.S. customer was consistent with the prices of "hundreds" of sales of goods of the same/equivalent CONNUM made by the mandatory respondents in the 2021-2022 annual administrative review. IDM at 4-5, 8-9. However, Commerce failed to acknowledge past cases in which it treated non-U.S. sales prices as relevant – even while citing such cases in support of its decision. It also failed to recognize that [                    ] mandatory respondents had hundreds of sales of the same/equivalent CONNUM as Co May's sale, while [

    ]. *See id.*; discussion *supra* at 8. Commerce also failed to recognize that Co May's sale

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00126                                                    NON-CONFIDENTIAL VERSION

[                                                              ] of the

relevant CONNUM in the 2021-2022 administrative review. *See* IDM at 4-5, 8-9; discussion *supra*

at 8.

      Likewise, Commerce failed to adequately explain or support its conclusion that Co May's

goods were resold at a profit in the United States by Co May's customer, [      ]. Commerce

declined to account for the antidumping duties that the customer paid at importation, reasoning

that just as the agency does not adjust for antidumping duties in determining the U.S. prices used

to calculate antidumping duty margins, it determines resale profitability in a *bona fide* analysis

without adjusting for such duties. IDM at 5. But in support, the agency cited a prior decision that

did not discuss the role of antidumping duties in determining the profitability of resales for

purposes of a new shipper review. *See id.*; discussion *supra* at 8-9. Nor did the agency explain why

it was necessary or reasonable to bootstrap the agency's practice with respect to determining export

price in an antidumping duty calculation onto the much different question of whether a goods were

resold within the U.S. at a profit. IDM at 5; discussion *supra* at 9. For that matter, the case that the

agency cited implied that the agency's practice is to include antidumping duties in its calculation

of net U.S. prices in antidumping duty calculations, rather than adjust such prices downward to

exclude them. The agency also failed to adequately explain or support its conclusion that [      ]

SG&A expense figure accurately captured U.S. warehousing and freight-to-customer costs. *See*

IDM at 6-7; discussion *supra* at 9.

      Finally, while Commerce conceded that an affiliation between [      ] and its resale

customers would bear on the overall *bona fides* of Co May's single sale, Commerce did not

adequately explain or support its determination that there was no such affiliation. IDM at 7-8.

[                                          ] shared a mailing address, all of the retail customers [

**Ct. No. 24-00126**                                                              NON-CONFIDENTIAL VERSION

], and record evidence indicated that this person was also at least employed by

[       ]. *See* discussion *supra* at 9-10. Commerce failed to acknowledge certain evidence submitted

by Co May itself on this last point, while mischaracterizing and relying on record documents that

did not provide any data on [       ]'s ownership or employees. IDM at 7-8.

## VI.   <u>ARGUMENT</u>

This appeal arises from Commerce's new shipper review of a single U.S. sale made by Co

May across the five-month period from August 1, 2022 – January 31, 2023. *See, e.g.*, *id.* at 1. A

threshold issue in a new shipper review is whether the requesting shipper had any *bona fide* sales

to the United States during the review period. 19 U.S.C. § 1675(a)(2)(B)(iv). In conducting a *bona*

*fide* sales analysis, "Commerce does not attempt to ascertain the fair value of the merchandise, but

examines each sale for its commercial reasonableness." *Huzhou Muyun Wood Co. v. United States*,

279 F. Supp. 3d 1215, 1219 (Ct. Int'l Trade 2017). As such, "the dumping margin calculation and

the *bona fide* analysis address different concerns." *Tiarjin Tiancheng Pharm. Co. v. United States*,

29 CIT 256, 262, 366 F. Supp. 2d 1246, 1252 n.7 (2005).

While the goal of the dumping calculation is to produce an accurate margin, the goal of the

*bona fide* analysis is to ensure that no margin at all is calculated based on sales that were purposely

structured to show little or no dumping, rather than sales that reasonably reflect the shipper's likely

future commercial practices in the U.S. market. *See Huzhou Muyun,* 279 F. Supp. 2d at 1219; *see*

*also* H. Rept. 114-114, Part I (May 14, 2015) at 88-89. In other words, the threshold *bona fide*

analysis is meant to prevent a new shipper from benefitting from an unfairly low dumping margin

that reflects an atypical sale or sales. *See, e.g.*, *Mattresses from China* PDM at 3-4. Where a new

shipper review is requested based on a single U.S. sale, that single sale warrants particularly strict

scrutiny. A single sale is more likely to have been structured than multiple sales, and by its nature

**Ct. No. 24-00126**                                                    NON-CONFIDENTIAL VERSION

a single sale provides limited insight into likely future selling behavior. *See, e.g.*, *Honey from China* IDM at 3-4 *Tiarjin Tiancheng*, 29 CIT at 275, 366 F. Supp. 2d at 1263 ("While a single sale is not inherently commercially unreasonable, it will be carefully scrutinized to ensure that new shippers do not unfairly benefit from unrepresentative sales.") (citations omitted).

The new shipper review here involved a single U.S. sale, meriting close scrutiny of the sale's *bona fides*. The sale was made at a [                    ] the new shipper, Co May, charged for frozen *pangasius* products that it sold to other markets during the review period. It was also [                    ] the weighted-average price of both mandatory respondents' sales of the relevant CONNUM (or its equivalent) during the 2021-2022 annual review period. Beyond this, Co May's U.S. customer, [       ], was required to deposit $2.39/kg antidumping duties on Co May's merchandise, while the mandatory respondents in the 2021-2022 review were subject to a $0.00 – 0.15 deposit rate during the new shipper period. NSR Request at Exhibit 3; *see also* 2020-2021 FR Notice; *supra* at 5, n.2. This [                    ] antidumping duty-loaded costs for goods shipped by either of the mandatory respondents to the 2021-2022 annual review.

Title 19 U.S.C. § 1675(a)(2)(B)(iv)(V) requires Commerce to consider, in its *bona fide* sales analyses, whether the new shipper's goods were resold at a profit to customers within the United States. Here, Co May's U.S. customer, [       ], was unable to resell Co May's goods for a price that covered the antidumping duties required at entry as well as other expenses that [       ] incurred in acquiring and reselling the merchandise. Further, the record indicates that [       ] failed to fully report all non-duty costs incurred in acquiring and reselling of Co May's goods, most particularly U.S. warehousing and freight-to-customer costs. Finally, the record indicated that [       ] was affiliated with the customers to which it resold Co May's merchandise, further calling

Ct. No. 24-00126                                        NON-CONFIDENTIAL VERSION

into question that resale price (and thus the profitability of the sale), as well as the sale's overall typicality.

Commerce nonetheless treated Co May's sale as *bona fide*. As explained below, this was in error. First, the agency failed to appropriately explain or support its determination that the price of Co May's sale indicated typicality, and reflected the company's likely future prices to the U.S. market. Second, Commerce failed to adequately explain and support its profitability analysis, both with respect whether to consider antidumping duties in the analysis and its conclusion that [     ] reported all expenses incurred in acquiring and reselling Co May's goods accurately and fully. Finally, Commerce did not adequately explain or support its conclusion that [     ] was not affiliated with its U.S. resale customers. Accordingly, Commerce's decision should be remanded for further consideration.

### A.   Commerce Did Not Adequately Explain or Support Its Conclusion Regarding the Typicality of Co May's Price

Congress has directed Commerce, in analyzing the *bona fides* of the sales underpinning a new shipper review, to focus on whether the sale is likely typical of the respondent's future commercial behavior, inclusive of selling price. 19 U.S.C. § 1675(a)(2)(B)(iv)(I).

Here, Co May made a single sale of subject merchandise to the United States, at a price of $[     ]/kg. NSR Request at Exhibit 3 and Exhibit 4 (Contract). This was a [              ] price than it charged for frozen *pangasius* fillets sold in other markets during the new shipper review period. *See id.* at Exhibit 6. Specifically, it sold such goods for an average price of $[     ]/kg in its home market, and $[     ]/kg in non-U.S. export markets. *See id.* Co May's U.S. sales price was also [          ] than the prices it charged in specific export markets with levels of economic development similar to the United States, such as [                    ],

15

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00126                                              NON-CONFIDENTIAL VERSION

and/or in markets to which it sold similar volumes of frozen fillets ([                    ]).
*See id.*; SC Memo at Attachment1. Indeed, the sale was [              ] than the company's sales
of frozen catfish fillets to any other market during the review period. NSR Request at Exhibit 6;
CFA's Case Brief at 14-15.

 In its IDM, Commerce rejected CFA's contention that the price of Co May's single U.S.
sale was atypical, and likely unreflective of its future commercial behavior in the U.S. market. It
discounted the relevance of Co May's non-U.S. sales prices during the review period, stating that
different markets may have different price points. IDM at 8-9. Beyond this, the agency concluded
that that the price of Co May's U.S. sale was consistent with the prices charged by CASEAMEX
and VHC in the 2021-2022 annual administrative review, and was thus commercially realistic. *Id.*
at 4-5, 8-9. Commerce also stated that these companies had hundreds of sales of the same (or
equivalent) CONNUM as Co May's single U.S. sale during the 2021-2022 review period, further
confirming the commercial reasonableness and likely typicality of Co May's selling price. *Id.* at
9.

 Commerce's conclusion that Co May's selling price was typical of its likely future sales to
the U.S. market should be remanded for further consideration. The agency did not provide any
support or explanation for its out-of-hand rejection of Co May's third-country sales prices as a
means of assessing typicality. *Id.* at 4-5, 8-9. While Commerce stated that "it is plausible that
different markets have different price points depending on differing market conditions," *id.* at 8-9,
it did not point to any evidence establishing that this was the case for any non-U.S. market to which
Co May sold. *Id.* Nor did it cite any evidence to show that the U.S. market was significantly
different in its market conditions from other markets to which Co May sold frozen pangasius fillets,
and that those differences translated into different market price points. *Id.* Commerce's speculation

16

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

**Ct. No. 24-00126**                                                    NON-CONFIDENTIAL VERSION

regarding the possibility that other markets might have different price points is not evidence, much less substantial evidence. *See, e.g., Asociacion Colombiana Exportadores de Flores v. United States*, 23 CIT 148, 153-154, 40 F. Supp. 2d 466, 472 (1999). Its outright dismissal of the relevance of Co May's third-country prices is also unexplained given that the agency has relied on such analyses in the past, including in a review that it cited and relied upon in this proceeding. *See, e.g., Tiarjin Tiancheng*, 29 CIT 268-69, 366 F. Supp. 2d at 1257-58 (noting Commerce's analysis of a new shipper's third-country prices in determining that the new shipper's U.S. sale was not *bona fide*); Xanthan Gum IDM at 9 (noting same); IDM at 5 (citing Xanthan Gum IDM).

Commerce's assertions regarding the mandatory respondents' sales during the 2021-2022 annual review period does not rehabilitate its analysis. Commerce stated that Co May's price fell between the prices charged by VHC and CASEAMEX for "hundreds of sales of the same CONNUM." IDM at 9. But [          ] hundreds of sales of a CONNUM equivalent to Co May's. Preliminary Analysis at Attachment 3. [          ] had just [          ] of an equivalent CONNUM, [                              ]. *Id.* Commerce did not explain why it was appropriate to treat [                              ] of the 2021-2022 review period as equivalent with [                                   ], which were made at an average price of $[          ]. *Id.*; *see also* Preliminary Analysis at Attachment 3. Nor did it recognize that the average per-kilogram price of VHC and CASEAMEX's collective sales of equivalent-CONNUM goods during the 2021-2022 review period was $[          ]/kg, as compared with Co May's $[          ]/kg price. *Compare* IDM at 9 *with* Preliminary Analysis at Attachment 3; *see also* 2021-2022 Sales Data (Native Excel Files).

Too, while Co May sold its goods to the U.S. market for a duty-exclusive price of $[          ]/kg, its customer was required to deposit the Vietnam-wide entity rate of $2.39/kg on Co

Ct. No. 24-00126                                                    NON-CONFIDENTIAL VERSION

May's shipment at entry, equating to a duty-inclusive price of $[    ]. *See, e.g.*, 2020-2021 FR

Notice; NSR Request at Exhibit 3. Meanwhile, the weighted-average antidumping duty-inclusive

price of the goods sold by VHC and CASEAMEX in the 2021-2022 administrative review was

$[    ]/kg. *See* discussion *supra* at 4-5.[4] As such, Co May's goods had an effective price that was

[                                                                    ] paid by CASEAMEX and VHC's

customers for equivalent-CONNUM goods during the 2021-2022 annual administrative review

period.

     In sum, Commerce's analysis of Co May's sales price was not adequately explained or

supported. The agency's dismissal of Co May's third-country prices was conclusory and based on

speculation. It was also inconsistent with Commerce's prior reliance on third-country prices in

evaluating the reasonableness of a new shipper's sales prices to the U.S. market. Further, the

agency's analysis of the sales prices of other shippers in the 2021-2022 administrative review

failed to acknowledge or discuss relevant facts that called its characterizations of the record and

conclusions into doubt. Commerce's analysis of Co May's sales price should therefore be

remanded for further consideration.

     **B.**     **<u>Commerce Did Not Adequately Explain or Support Its Conclusion Regarding
the Profitability of Resales</u>**

     Just as Congress directed Commerce to consider the selling price of sales underpinning a

new shipper review in analyzing the sales' *bona fides*, it directed the agency to consider whether

the goods were resold in the U.S. market at a profit. 19 U.S.C. § 1675(a)(2)(B)(iv)(V).

---

[4]     As discussed in Section B below, Commerce refused to consider the customer's
antidumping duty deposits in assessing the profitability of resales.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00126                                                        NON-CONFIDENTIAL VERSION

Here, Co May sold its goods to [        ] for a duty-exclusive price of $[      ]/kg. See, e.g., NSR Request at Exhibit 3. However, [        ] was required to deposit the Vietnam-wide entity rate of $2.39/kg on Co May's shipment at entry, which here equated to $[            ] in deposits. *See, e.g.,* 2020-2021 FR Notice; NSR Request at Exhibit 3. In obtaining and reselling the goods, [       ] also reported incurring costs besides antidumping duties (including Co May's price) equal to [            ]. Customer SQR at Attachment A. In reporting these costs, [       ] stated it had treated various expenses, including warehousing and freight-to-customer charges, as part of SG&A, at a value equal to [                      ]. *Id.* Here, that value was $[

           ]. *Id.*

In its case brief, CFA argued that [                 ] in duty deposits should be taken into account in determining the profitability of the company's resales of Co May's goods. CFA's Case Brief at 6-8. CFA also argued that the non-duty expenses that [       ] reported were incomplete. While [      ] had reported that costs such as warehousing and freight to customers were covered by its reported SG&A expenses, it did not support its reporting. *Id.* at 9-11; *see also* IDM at 6-7. That reporting was also undermined by other evidence on the record, particularly information regarding the expense required to freight goods [                              ]. CFA's Case Brief at 9-11; *see also* IDM at 6-7.

In its final determination, Commerce refused to treat antidumping duty deposits as a cost for purposes of its profitability analysis. It also found that [      ]'s non-duty expense reporting was complete and accurate. However, as further detailed below, the agency failed to adequately explain or support these decisions.

Ct. No. 24-00126

### 1. Commerce Did not Adequately Explain or Support Its Treatment of Antidumping Duty Deposits

In its case brief, CFA argued that [                    ] in duty deposits should be taken into account in determining the profitability of the company's resales of Co May's goods. CFA's Case Brief at 6-8. However, Commerce found that it was improper to consider the antidumping duties that [      ] was required to deposit at the time of entry, stating that to do so would violate longstanding practice. IDM at 5. In support, Commerce cited a new shipper review of the antidumping duty order on Chinese xanthan gum, in which it stated that when determining U.S. export prices for purposes of its antidumping duty calculations, it does not adjust for antidumping duty deposits. *Id.* (citing Xanthan Gum IDM at cmt. 2).

Commerce's explanation is insufficient. Commerce cited its practice with respect to calculating dumping margins as the basis for refusing to consider dumping duties in its *bona fide* analysis. But as the court has recognized, "the dumping margin calculation and the *bona fide* analysis address different concerns." *Tiar jin Tiancheng Pharm. Co. v. United States*, 29 CIT at 263 n.7, 366 F. Supp. 2d at 1252 n.7. As such, the fact that Commerce treats antidumping duty deposits in a particular way when calculating dumping margins neither explains nor justifies, on its own, the treatment of such duties in its *bona fide* analysis. Nor does the agency's citation of the Xanthan Gum IDM resolve the issue. While that decision arose from a new shipper review, the agency did not discuss the treatment of antidumping duty deposits in analyzing resale profitability in that case. *See* Xanthan Gum IDM at 10.

Further, what Commerce did say in that case makes the agency's reasoning here all the more obscure. In the Xanthan Gum IDM, Commerce noted that its practice in calculating antidumping duties is to *include* antidumping duty deposits in U.S. prices, rather determining U.S.

20

**Ct. No. 24-00126**                                                       **NON-CONFIDENTIAL VERSION**

prices net of such deposits. *Id.* The statement in Xanthan Gum thus undercuts the agency's refusal to include antidumping duty deposits in its profitability resale analysis here. In sum, the agency's explanation for refusing to consider antidumping duty deposits in the *bona fide* analysis is too thin – and internally contradictory – to be sustained.

### 2.   Commerce Did not Adequately Explain or Support Its Conclusions Regarding SG&A Expenses

In its case brief, CFA argued that the non-duty expenses that [      ] reported were incomplete, preventing an accurate profitability analysis. CFA's Case Brief at 9-11. In particular, CFA noted that while [      ] had reported that costs such as warehousing and freight-to-customers were covered by its reported SG&A expenses, it reported a lump sum value for such expenses equal to [      ] of resale value. *Id.*; *see also* IDM at 6-7. This value was not supported by any documentary evidence. CFA's Case Brief at 9-11. CFA also explained that its completeness and accuracy were undermined by other information on the record. *Id.*

Commerce nonetheless concluded that the reported SG&A expense figure was complete and that it accurately captured expenses such as U.S. warehousing and freight-to-customer charges. IDM at 6-7. In this regard, Commerce observed that it did not ask [      ] to supplement or support its SG&A expense reporting. *Id.*

This explanation is inadequate to support the agency's conclusion. As an initial matter, while the agency may not have specifically requested that [      ] document that it in fact costed out SG&A expenses [                          ] of product resale value (for example, by providing an audited company financial statement for the relevant time period that reflected [      ] SG&A figure), the agency did not explain why such a practice would generate accurate or complete expense reporting with respect to the sales at issue. *Id.* Indeed, application of

Ct. No. 24-00126                                          NON-CONFIDENTIAL VERSION

a straight [      ] figure appears particularly unlikely to accurately capture the specific expenses

involved with reselling Co May's goods, given that [      ] resold those goods to [

]. The goods accordingly spent [

] and were freighted [

]. Customer SQR at Attachments A-5 and A-7.

Moreover, the agency did not engage with record evidence cited by CFA that undermined

the completeness and accuracy of the reported SG&A figure, particularly with respect to freight-

to-customer expenses. Specifically, CFA presented information showing that it would cost

approximately [         ] to ship shelf-stable goods to the [            ] customers to which [      ]

resold Co May's merchandise, some of which were [

]. CFA's Case Brief at 11; Petitioners' Rebuttal at 9-10 and Exhibits RFI-3

and RFI-4.[5] Commerce did not even acknowledge the existence of this information, much less

explain why it did not detract from its conclusion that [      ]'s SG&A figure accurately captured

the expenses associated with storing Co May's merchandise pending resale and then shipping it to

customers. IDM at 6-7. Without that explanation, Commerce's conclusion cannot meet the

standard of review.

### 3.    Conclusion Regarding Resale Profitability

Commerce failed to adequately explain or support its conclusion that [      ] resold Co

May's merchandise in the United States at a profit. The reasoning the agency provided for

discounting antidumping duty deposits in its analysis is conclusory, fails to recognize that the *bona*

*fide* analysis and the calculation of antidumping duties are distinct, and appears to be contradicted

---

[5]      As CFA noted, this [         ] figure was likely understated in its own right, as it does not
account for the [                                              ]. CFA's Case Brief at 10.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00126                                    NON-CONFIDENTIAL VERSION

by the case it cited as support. Commerce also failed to adequately explain why it concluded that

[      ]'s reported SG&A expense appropriately and accurately captured all of the costs allegedly

included in that figure, particularly as the agency ignored record evidence calling its conclusion

into question.

### C.    Commerce Did Not Adequately Explain or Support Its Conclusion Regarding the Relationship between Co May's Customer and the Resale Customers

While Congress directed Commerce to consider certain specified factors in its *bona fide*

analysis, it also directed the agency to consider "any other factor {that Commerce} determines

relevant as to whether {the} sales are, or are not, likely to be typical of those the {new shipper}

will make after the completion of the review." 19 U.S.C. § 1675(a)(2)(B)(iv). Here, Commerce

conceded that the existence of a relationship (other than that of unaffiliated seller and buyers)

between [      ] and its resale customers would be a potentially relevant factor, particularly with

respect to the profitability of resale. IDM at 7-8.

In its case brief, CFA argued that such a relationship existed. CFA's Case Brief at 12-13.

CFA noted that [      ] shared an address [                ] resale customers. *Id.* at 12; *see*

*also* IDM at 7-8. CFA also noted that the resale customers all had [                    ].

CFA's Case Brief at 12. CFA further pointed to record information indicating that [      ] was

also involved with [      ], and shared the [

]. *Id.*

Commerce concluded that there was no relevant relationship between [      ] and its

customers, beyond that of unaffiliated buyers and seller. IDM at 7-8. It noted that [      ] resold to

Co May's goods to all resale customers for the same price, including [

]. *Id.* It also noted that while it was clear that [                ] of all

of the resale customers, the evidence regarding [                ] itself was mixed. *Id.*

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

**Ct. No. 24-00126**                                                      NON-CONFIDENTIAL VERSION

at 7. Specifically, while it acknowledged that the record contained certain "Wikipedia-style" articles indicating that [                    ], it stated that it was weighing more heavily information sourced from [                ], which it characterized as consistent with [

                    ]. *Id.*; *see also* Customer SQR at Exhibit

1 ([          ]) ([       ]'s statement regarding ownership).

> This explanation lacks support, as the agency's reasoning displays a disconnect from both logic and record facts. As an initial matter, it is not clear why the fact that [

                    ] matters, given that all the resale customers [                    ]. The resale customers are undoubtedly affiliated with each other, regardless of whether [

                    ]. And given the fact that nearly all of them also [                    ], the coincidence of pricing does not appear logically to support the conclusion that the price must at arm's-length, or to be uninfluenced by a relationship that unaffiliated parties would not have.

> And with respect to whether [          ] is involved with [      ], the website data that Commerce relied upon does not in fact contain any information about [

                    ]. SDQR at Exhibit 1, Attachment B; *see also* IDM at 7. It therefore cannot provide support for, or display consistency with, [       ]'s separate statement regarding its ownership. *Compare* SDQR at Exhibit 1, Attachment B *with* Customer SQR at Exhibit 1 ([            ]); *see also* IDM at 7. The agency also failed to acknowledge certain record evidence undermining its conclusion that there was no relationship between [          ] and [      ]. Specifically, even as Commerce relied on information supposedly contained in Attachment B to Co May's SDQR, it failed to recognize that Attachment D to the same filing contained a list of [      ] officers and employees, which indicated that [                    ]. *Compare* IDM at 7 *with* SDQR at Exhibit 1, Attachment D. Further, the accuracy of the list in Attachment

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00126                                    NON-CONFIDENTIAL VERSION

D is corroborated by email correspondence between Co May and [        ], as the list names, in

addition to [            ], each of the individuals that represented [        ] in that correspondence,

including [                                    ]. *Compare* NSR Request at Exhibit 5 *with*

SDQR at Exhibit 1, Attachment D.

In sum, Commerce's conclusion that there was no relationship between [        ] and its

resale customers is inadequately supported and explained. Commerce's rationale for discounting

the shared address is logically flawed. Its basis for concluding that the record did not otherwise

demonstrate a relationship is also unsound, given that it misconstrued certain record evidence

while ignoring other relevant information undermining its conclusion. As such, a remand is

required.

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED

Ct. No. 24-00126                                    NON-CONFIDENTIAL VERSION

## VII.   <u>CONCLUSION</u>

Commerce's *bona fide* sales analysis fails to comport with the standard of review. The agency failed to appropriately explain or support its determination that the price of Co May's sale indicated typicality, and reflected the company's likely future prices to the U.S. market. Likewise, Commerce failed to adequately explain and support its profitability analysis, both with respect to declining to consider antidumping duties and concluding that [      ] reported all expenses incurred in acquiring and reselling Co May's goods accurately and fully. Finally, Commerce did not adequately explain or support its conclusion that [      ] was not affiliated with its U.S. resale customers. Accordingly, Commerce's decision should be remanded for further consideration.

Respectfully submitted:

*/s/ Nazak Nikakhtar*
Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

**WILEY REIN LLP**
2050 M Street, NW
Washington, DC 20036
(202) 719-7000

*Counsel to the Catfish Farmers of*
*America and individual U.S. catfish*
*processors America's Catch, Inc.,*
*Alabama Catfish, LLC d/b/a Harvest*
*Select Catfish, Inc., Consolidated*
*Catfish Companies, LLC d/b/a*
*Country Select Catfish, Delta Pride*
*Catfish, Inc., Guidry's Catfish, Inc.,*
*Heartland Catfish Company,*
*Magnolia Processing, Inc. d/b/a*
*Pride of the Pond, and Simmons*
*Farm Raised Catfish, Inc.*

Dated: December 16, 2024

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Scheduling Order (Oct. 29, 2024), ECF No. 17, the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 7,902 words.

_/s/ Nazak Nikakhtar_
(Signature of Attorney)

Nazak Nikakhtar
(Name of Attorney)

Catfish Farmers of America, *et al.*
(Representative Of)

December 16, 2024
(Date)