**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

<table>
<tr>
<td>

**CATFISH FARMERS OF AMERICA,** *et al.,*

               **Plaintiffs,**

        **v.**

**UNITED STATES,**

               **Defendant.**

</td>
<td>

**Before: Hon. Jane A. Restani,**
        **Senior Judge**

**Court No. 24-00126**

**NON-CONFIDENTIAL VERSION**

**Business Proprietary Information Removed from Pages: Table of Contents, 2-4, 7-16**

</td>
</tr>
</table>

**PLAINTIFF CATFISH FARMERS OF AMERICA'S REPLY BRIEF**

Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

WILEY REIN LLP
2050 M Street, NW
Washington, DC 20036
(202)719-7000

*Counsel to the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc.*

**Dated: March 14, 2025**

Ct. No. 24-00126          BUSINESS PROPRIETARY INFORMATION    NON-CONFIDENTIAL VERSION
                                HAS BEEN DELETED

## <u>TABLE OF CONTENTS</u>

Page

I.    INTRODUCTION ........................................................................................... 1

II.   ARGUMENT ................................................................................................. 1

      A.   Commerce Has Not Yet Adequately Explained the Basis for
           Ignoring Prices Charged by Co May in Non-U.S. Markets in
           Determining Typicality ............................................................................3

           1.   The [                              ] between the price Co May
                charged for its U.S. sale and the price Co May charged in
                other markets is relevant to determining whether Co May's
                U.S. sale was *bona fide*. .............................................................4

           2.   Commerce's assertions regarding the mandatory
                respondents' sales during the 2021-2022 annual review
                contradict the record evidence and are otherwise
                unexplained. ................................................................................6

      B.   Commerce Failed to Consider the Language of the Statute, Record
           Evidence and Its Own Practice in Concluding that [      ] Could
           Resell Co May's Product at a Profit. ......................................................8

           1.   Antidumping duties are relevant to the profitability
                analysis..........................................................................................9

           2.   Commerce continues to ignore contradictory record
                evidence in its SG&A analysis. ..................................................10

      C.   Commerce Cannot Use Exhaustion Principles to Hide Its Failure to
           Adequately Explain or Support its Conclusion Regarding the
           Resale Customers...................................................................................11

           1.   CFA raised the affiliated party argument in the
                administrative proceedings. .......................................................12

           2.   Commerce has not adequately explained or supported the
                basis for its conclusion that [      ] and its downstream
                customers are unrelated................................................................14

III.  CONCLUSION ............................................................................................ 16

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*,
    591 U.S. 1 (2020) ..................................................................................................2

*Jacobi Carbons AB v. United States*,
    222 F. Supp. 3d 1159 (Ct. Int'l Trade 2017) ....................................................14

*Jianxiang Yuanxin Import & Export Co. v. United States*,
    71 F. Supp. 3d 1338 (Ct. Int'l Trade 2015) ......................................................14

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ..............................................................................................16

*Rhone Poulenc, Inc. v. United States*,
    899 F.2d 1185 (Fed. Cir. 1990) ....................................................................13, 14

*Shiazhuang Goodman Trading Co. v. United States*,
    172 F. Supp. 3d 1363 (Ct. Int'l Trade 2016) ......................................................6

*Suramerica de Aleaciones Laminades, C.A. v. United States*,
    44 F.3d 978 (Fed. Cir. 1994) ..........................................................................5, 11

*Tianjin Tiancheng Pharm. Co. v. United States*,
    29 CIT 256, 366 F. Supp. 2d 1246 (2005) ..............................................1, 5, 7, 8

**Statutes**

19 U.S.C. § 1675(a)(2)(B)(i) ......................................................................................1

19 U.S.C. § 1675(a)(2)(B)(iv) ...........................................................................1, 5, 12

**Administrative Materials**

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*,
    89 Fed. Reg. 53,043 (Dep't Commerce June 25, 2024) ..................................3, 4

H. Rept. 114-114, Part I (May 14, 2015) ...................................................................1

*Mattresses From the People's Republic of China*,
    86 Fed. Reg. 11,924 (Dep't Commerce Mar. 1, 2021) ........................................1

*Xanthan Gum from the People's Republic of China*,
    81 Fed. Reg. 56,586 (Dep't Commerce Aug. 22, 2016) ....................................10

## I.      **INTRODUCTION**

On behalf of the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc. (collectively, "CFA"), we respectfully submit this brief in reply to the response filed by Defendant the United States ("Defendant"). *See* Def. Resp. to Pl.'s R. 56.2 Mot. for J. on the Agency R. (Feb. 02, 2025), ECF No. 20 ("Def. Resp.").

## II.     **ARGUMENT**

In enacting the "new shipper review" provisions of the Tariff Act, 19 U.S.C. § 1675(a)(2)(B)(i), Congress instructed Commerce to ensure that a new shipper's U.S. sales are *bona fide*. *Id.* § 1675(a)(2)(B)(iv). Congress's express intent in requiring *bona fide* sales is to prevent a foreign company from "enter{ing} into a scheme to structure a few sales to show little or no dumping," H. Rept. 114-114, Part I (May 14, 2015) at 89, so that the company "unfairly benefit{s} from an atypical sale {to} obtain a lower dumping margin than the respondent's usual commercial practice would dictate," Preliminary Decision Memorandum accompanying *Mattresses From the People's Republic of China*, 86 Fed. Reg. 11,924 (Dep't Commerce Mar. 1, 2021) (prelim. intent to rescind the 2020 antidumping duty new shipper review) at 3-4. A key focus in Commerce's inquiry is whether the new shipper's selling price is typical, 19 U.S.C. § 1675(a)(2)(B)(iv), and reviews based on a single sale warrant special scrutiny since such sales are more easily manipulated, *see, e.g.*, *Tianjin Tiancheng Pharm. Co. v. United States*, 29 CIT 256, 275, 366 F. Supp. 2d 1246, 1263 (2005).

Here, CFA pointed to multiple data points indicating that new shipper Co May Import-Export Company Limited's ("Co May") single sale of Vietnamese *pangasius* fillets was atypical and otherwise non-*bona fide*, including evidence that: (1) Co May's price for its U.S. sale was [                    ] than the prices it charged in other markets; (2) Co May's sale price was [                ] than the average price charged by the mandatory respondents in the contemporaneous 2021-2022 annual administrative review; (3) the antidumping duty-inclusive price that Co May's customer paid for Co May's product was [                ] the antidumping duty-inclusive price of equivalent goods shipped by the mandatory respondents in the 2021-2022 review; (4) Co May's U.S. customer, [                          ] could not resell Co May's products at a profit; and (5) [         ] was affiliated with the customers that purchased Co May's goods, indicating that [        ]'s downstream sales were not arms' length transactions and casting further doubt on the *bona fide* nature of Co May's sale to [       ]. *See generally* Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Case Brief* (May 17, 2024), C.R. 405, P.R. 204, at 6-13 (*"CFA Case Brief"*). Nevertheless, Commerce determined that Co May's single sale was *bona fide*. In so doing, Commerce overlooked and mischaracterized record evidence, ignored its own past practice, and adopted reasoning unsupported by—and contrary to—the decisions that Commerce itself cited. Defendant's attempts to substantiate Commerce's determination before this Court likewise fail to engage with either the record or precedent; they also present *post hoc* justifications that this Court may not consider. *See Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*, 591 U.S. 1, 22-23 (2020) (emphasizing importance of "{c}onsidering only contemporaneous explanations for agency action" and rejecting *post hoc* rationalizations).

**A.**  **Commerce Has Not Yet Adequately Explained the Basis for Ignoring Prices Charged by Co May in Non-U.S. Markets in Determining Typicality**

Co May's sole U.S. sale was [

]. CFA Case Brief at 15. During the relevant period, Co May made sales in [

] at prices ranging from [        ] to [        ], or [        ] on average. *Id.* Co May's

sale to [     ] in the U.S. was priced at [

]. *Id.* Commerce discounted this information as indicating that Co May's U.S.

sale was not likely to be typical of future U.S. sales, reasoning that (1) "there is no requirement

that the U.S. sales price must be the same as a company's price for its sales to other markets;" (2)

"it is plausible that different markets have different price points depending on differing market

conditions;" and (3) Co May's price "fell in the center of the distribution of the U.S. prices of the

mandatory respondents," which "had hundreds of sales of the same CONNUM sold by Co May"

during the administrative review period. Issues and Decision Memorandum accompanying

*Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 89 Fed. Reg. 53,043 (Dep't

Commerce June 25, 2024) (final results of antidumping duty new shipper rev.; 2022-2023), P.R.

211, at 8-9 ("IDM").

Before this Court, Defendant reiterates that the Tariff Act does not require that U.S. and

third country prices be "the same," Def. Resp. at 12-13, and adds that "labeling a price as

aberrational is unreasonable without considering the average unit values (AUV) prevailing at the

time of sale." *Id.* at 13. Defendant also repeats Commerce's arguments that Co May's price was

consistent with the prices charged by the mandatory respondents in the 2021-2022 annual

administrative review. *Id.*

Defendant has not repeated Commerce's argument that different markets might have

different price points depending on conditions, tacitly conceding that this position is speculative,

unsupported by the record and, at the very least, unexplained in Commerce's final decision. *See id.; see also Certain Frozen Fish Fillets From the Socialist Republic of Vietnam*, 89 Fed. Reg. 53,043 (Dep't Commerce June 25, 2024) (final results of antidumping duty new shipper rev.; 2022-2023), P.R. 216; IDM at 8-9; Pl.'s R. 56.2 Mot. for J. on the Agency R. (Dec. 16, 2024), ECF No. 18, at 16 ("CFA's Opening Brief"). This alone merits remand. And if this were not enough, the agency's remaining explanations for its decision to discount evidence and arguments regarding the atypicality of Co May's sale price are equally insufficient, as detailed below.

       **1.**    **The [          ] between the price Co May charged for its U.S. sale and the price Co May charged in other markets is relevant to determining whether Co May's U.S. sale was *bona fide*.**

Commerce's and Defendant's argument that the Tariff Act does not require U.S. and foreign market prices to be the same misses the mark twice over. As an initial matter, CFA has not argued that Co May's U.S. sale is atypical because its [             ] as third country prices. Rather, CFA has emphasized that Co May's U.S. price was [              ] than the average sale price in other markets, and that Co May's U.S. price was [        ] than the prices at which Co May sold in markets of comparable economic development to the U.S., like [              ], and markets to which Co May sold similar volumes of *pangasius*, like [             ]. *See* Letter from Mayer Brown LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Request for New Shipper Review – Co May Import Export Company Limited* (Feb. 14, 2023), C.R. 1, P.R. 1, at Exhibit 6 ("NSR Request").

CFA respectfully submits that, to carry out its statutory obligations and comply with the substantial evidence standard, Commerce was required to engage with this evidence and provide an adequate explanation as to why Co May's divergent U.S. sales price may nevertheless be

typical of the company's general selling behavior and likely future U.S. sales. *See* 19 U.S.C. § 1675(a)(2)(B)(iv); *see also Suramerica de Aleaciones Laminades, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (Commerce "must take into account whatever in the record fairly detracts from" the evidence that supports Commerce's decision, including "contradictory evidence or evidence from which conflicting inferences could be drawn.").

Commerce's dismissal of the record evidence regarding Co May's third-market sales prices is all the more unexplained given that the agency has itself recognized the importance of considering third country sales pricing in undertaking the highly contextual typicality analysis. CFA's Opening Brief at 16-17. Indeed, as Defendant acknowledges, "any factor which indicates that the sale under consideration is not likely to be typical . . . is relevant." Def. Resp. at 10 (quoting *Tianjin*, 366 F. Supp. 2d at 1250). *Tianjin* expressly discussed, and approved of, the agency's past treatment of third country prices as one such relevant factor. *Tianjin*, 366 F. Supp. 2d at 1257-1258 ("agree{ing with Commerce} that there is no reason to discount the third-country data").

Defendant's new argument—namely, that it is improper to label a price atypical without considering prevailing AUVs at the time of sale—cannot be considered because Commerce did not advance it in making its decision. *See* IDM at 8-9. In any event, this *post-hoc* argument is misguided. As previously explained by this Court in *Tianjin*, "third-country sales {are} relevant to the determination" of typicality in part because those sales help determine whether a new shipper's pricing behavior, as a general matter, is "reflective of the AUV data during the POR." *Tianjin*, 366 F. Supp. 2d at 1258.[1] Put differently, third country pricing is relevant to determining

---

[1] In *Tianjin*, the "AUV data" consisted of U.S. Customs & Border Protection (CBP) data regarding the overall volume and value of glycine imports into the United States during the relevant time period. Here, rather than

whether a new shipper typically prices its product consistent with, above, or below prevailing AUVs. Thus, the Defense's argument regarding prevailing AUVs does not negate the relevance of Co May's third country sales—it only underscores the agency's failure to consider relevant record information.

Finally, while Defendant relies on *Shiazhuang Goodman Trading Co. v. United States*, 172 F. Supp. 3d 1363 (Ct. Int'l Trade 2016), as support for its the agency's inadequately explained dismissal of third-country prices, the decision is not helpful to its case. There, no argument was raised as to the relevance of the new shipper's third-country pricing. Rather, Commerce determined that the company had no *bona fide* U.S. sales based on a comparison of its U.S. sales prices to the POR-wide AUV for all imports of the relevant good into the United States. The Court concluded that in relying solely on the POR-wide AUV for such imports, Commerce "failed to analyze record data showing that a significant increase in . . . prices occurred during the POR." *Id.* at 1375. Insofar as the case is applicable to the agency's dismissal of the relevance of Co May's third-country pricing, *Shiazhuang* simply reinforces that remand is appropriate where, as here, Commerce "fail{s} to consider a commercially significant aspect of the comparison it was attempting to make." 172 F. Supp. 3d at 1375-1376.

### 2. Commerce's assertions regarding the mandatory respondents' sales during the 2021-2022 annual review contradict the record evidence and are otherwise unexplained.

Defendant, like Commerce, insists that Co May's U.S. price "was commercially reasonable because it fell in the center of the distribution of the U.S. prices to mandatory respondents in the POR-adjacent review." Def. Resp. at 13. But as CFA has argued, Commerce

---

this type of data, the "AUV data" to which the Defendant refers is the data regarding the prices at which the mandatory respondents in the contemporaneous 2021-2022 review sold their product in the U.S. market.

did not properly explain or support its conclusion on this point, instead ignoring—or at least not showing its work—with respect to important aspects of the problem before it.

Below, Commerce asserted that the mandatory respondents "had hundreds of sales of the same CONNUM sold by Co May" during that period. IDM at 9. CFA explained in its Opening Brief that, in fact, only one of those respondents had hundreds of sales—the other had just [

]. CFA's Opening Brief at 17. Defendant appears to concede this point but asserts that (1) the "data from the POR-adjacent administrative review was the most contemporaneous respondent database available;" and (2) "a determination that a sale was not *bona fide* may not solely rest on an atypically high price," citing *Tiarjin Tiancheng*. Def. Resp. at 13 (emphasis added). Both arguments fail.

The first argument is not just *post-hoc*; it is beside the point. CFA's argument is not, and never has been, that the agency erred simply by considering then-available data from the 2021-2022 administrative review in determining the typicality of Co May's sales price. Rather, CFA's point is that, in considering that data, the agency was required to assess and characterize it fairly. CFA's Opening Brief at 17. As such, Commerce could not, consistent with the standard of review, fail to explain its treatment of [                              ], or address the difference between the average price at which the mandatory respondents in the 2021-2022 review period sold their subject merchandise, and the price at which Co May sold its single U.S. shipment of subject goods during the new shipper review period. *Id*. at 16-17. Defendant's argument is not responsive to these claims.

Defendant's reliance on *Tiarjin* to support Commerce's determination that Co May's single U.S. sale was *bona fide* verges on the bizarre. In making the claim, Defendant appears to concede that Co May's sales price was, in fact, "atypically high" in comparison with that of the

mandatory respondents in the 2021-2022 annual review, to say nothing of the Co May's prices to third-country markets. Further, the Court in *Tianjin* emphasized that the new shipper's U.S. sale price "has significant weight, and cannot necessarily be offset by a recitation of other factors by which the sale could be considered typical . . . . The transaction must be 'normal' as a whole, *and price must be a large part of what produces 'normal' sales in the context of an antidumping determination*." 366 F. Supp. 3d at 1263 (emphasis added). According to this logic, an atypically high sales price necessarily "has significant weight." *Id.* As explained in CFA's Opening Brief, Commerce failed to adequately explain or support its decision that Co May's single U.S. sale was priced in a manner typical of its likely future sales. CFA's Opening Brief at 16-18. To the extent that the defense now concedes that the sale was atypically priced, this only strengthens the case for remand. And finally, even if this Court were to accept the defense's contention that pricing atypicality is insufficient to demonstrate that a sale is not bona fide, Commerce did not properly explain or support its determinations with respect to the profitability of resale and/or the relationship between Co May's customer, [    ], and [    ] resale customers, as explained in CFA's Opening Brief and further detailed below.

**B.** **Commerce Failed to Consider the Language of the Statute, Record Evidence and Its Own Practice in Concluding that [    ] Could Resell Co May's Product at a Profit.**

Defendant argues that "the resale price of Co May's customer [    ] is irrelevant to Commerce's *bona fide* analysis consideration." Def. Resp. at 14. This is wrong. Section 1675(a)(2)(b)(iv)(V) explicitly requires Commerce to consider "whether the subject merchandise . . . was resold in the United States at a profit" in determining whether a U.S. sale was *bona fide*. Here, the record reflects that Co May sold its goods to [    ] at a [                    ]. CFA Case Brief at 6. Specifically, [    ] reported expenses of [        ] for Co May's product,

plus [



          ] *plus* [                                              ], bringing the costs associated with

importing and reselling Co May's goods up to [          ]. *Id.*

          Meanwhile, [      ] reported that it resold the product [                              ]. *Id.*

at 7. Thus, the record reflects that Co May's customer [


          ]. *Id.* Under Section 1675(a)(2)(b)(iv)(V), this was a relevant aspect of the bona fide

analysis. It was therefore incumbent on the agency not only to consider the profitability of the

resale, but to adequately explain and support its treatment of antidumping duties and SG&A

costs in doing so. In this regard, while Defendant argues that (1) antidumping duties are

irrelevant to the profitability analysis, and (2) [      ] properly reported its SG&A figures, it fails

to establish that Commerce complied with the standard of review.

          **1.  Antidumping duties are relevant to the profitability analysis.**

          [

                                        ] on the grounds that the company [

                                        ] Letter from Mayer

Brown LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from Vietnam: Unaffiliated*

*Customer Supplemental Questionnaire* (Feb. 8, 2024), C.R. 380, P.R. 187, at Exhibit 1,

Attachment A ("Customer SQR"). But as CFA explained in its case brief, Commerce's

profitability analysis should not have reflected [

                                        ] This reasoning runs counter to the *bona fide*

analysis demanded by the Tariff Act which, as Defendant concedes, requires Commerce to

consider whether a transaction is "atypical or unrepresentative of normal business practice." *See* Def. Resp. at 10. Such normal business practices demand assessing the circumstances of a sale in light of facts *known* at the time of sale, rather than [                    ]. CFA Case Brief at 7.

Defendant nevertheless maintains that the agency "does not adjust for cash deposit rates when calculating net prices in its price comparison," and that "cash deposits . . . are not expenses that should be deducted from U.S. price." Def. Resp. at 14. Defendant specifically argues that cash deposits should not be considered since they are "estimates of an uncertain duty liability to be assessed in the future." *Id.* at 14-15. In support of these propositions, Defendant cites *Xanthan Gum from the People's Republic of China*, 81 Fed. Reg. 56,586 (Dep't Commerce Aug. 22, 2016) (rescission of 2014-2015 antidumping duty new shipper rev.). *Id.* at 15. But as CFA has explained, *Xanthan Gum* is inapposite and, if anything, undermines the agency's explanation and basis for its treatment of antidumping duty deposits here. CFA's Opening Brief at 9, 20-21. Defendant's conclusory reliance on *Xanthan Gum* is no more elucidating than Commerce's was, and certainly does not show that Commerce provided adequate explanation or support for its treatment of antidumping duties for purposes of the resale profitability analysis here.

**2. Commerce continues to ignore contradictory record evidence in its SG&A analysis.**

In its case brief, CFA asserted that [        ] non-duty expenses were incomplete and unreliable. CFA Case Brief at 9-11. Specifically, CFA explained that [        ] use of a lump sum value for SG&A expenses was unlikely to accurately capture [        ] actual expenses since [      ] resold Co May's products to [                        ]. As a result, [          

                        ] and transport the products [        

                        ]. *See id.; see also*

Customer SQR at Exhibit 1, Attachments A-5 and A-7. Rather than engage with this evidence, Commerce simply stated that it had not requested that [      ] support or explain its reported SG&A expense figure. IDM at 6-7.

Defendant elaborates on this explanation, arguing that [      ] "appropriately provided information in accordance with the requirements that Commerce requested in its importer questionnaire." Def. Resp. at 15. In this regard, Defendant contends that Commerce has unfettered discretion to determine what "particular quantum of evidence {is} adequate" to support the agency's conclusions. *See id.* at 16. Such an assertion is wholly inconsistent with bedrock principles of American administrative law—and certainly with the standard of review governing Commerce's antidumping duty determinations. Binding precedent confirms that the agency must acknowledge the existence of record evidence that detracts from the agency's conclusion that [      ] reporting fully and reasonably reflected the expenses associated with the purchase and resale of the goods it bought from Co May—and must also adequately explain why this evidence does not undermine Commerce's overall conclusion that Co May's U.S. sale was *bona fide. See Suramerica*, 44 F.3d at 985. Simply stating that "Commerce was satisfied with supporting documentation and accepted the customer's reported figures as accurate," without such an explanation, does not suffice. Def. Resp. at 16*; see also Suramerica*, 44 F.3d at 985 (Commerce fails to support its decision with substantial evidence when it fails to consider "contradictory evidence or evidence from which conflicting inferences could be drawn" in making its determination).

**C.** **Commerce Cannot Use Exhaustion Principles to Hide Its Failure to Adequately Explain or Support its Conclusion Regarding the Resale Customers.**

As CFA explained in its case brief, [

] CFA Case Brief at 12. CFA asserted

that the fact that [                                        ], coupled with the company's [

                ] of Co May's products, undermined [          ] credibility and served as evidence

that Co May's sale [          ] was not *bona fide. Id.* at 12-13. In response, Defendant confusingly

asserts that (1) CFA failed to exhaust this argument; (2) the affiliation between [          ] and

[                          ] is irrelevant to the statutory *bona fide* analysis; and (3) the record does not

reflect any affiliation between [          ] and its customers. Def. Resp. at 17-18. None of these

arguments withstand scrutiny.

### 1.   CFA raised the affiliated party argument in the administrative proceedings.

Defendant states that CFA raised the issue of affiliated parties under an arm's length

transaction analysis in its case brief but now "raises this claim as one of the unspecified factors"

that Commerce must consider under 19 U.S.C. § 1675(a)(2)(B)(iv). *Id.* at 17. Defendant then

asserts that CFA "{s}pecifically . . . argues that an affiliated relationship existed between [          ]

and [                    ] resale customers" because "they share an address and [

                ]" *Id.* Defendant then contends that "CFA did not make *this* specific argument

before Commerce" and thus it is precluded from doing so now. *Id.* (emphasis added).

Commerce's argument is muddled, misleading, and wrong.

It is unclear whether Defendant is taking the position that: (1) CFA did not specifically

argue that [                                        ] based on evidence that [

                          ] or (2): CFA did not specifically relate this argument to the

"any other factor" prong of the *bona fide* analysis under 19 U.S.C. § 1675(a)(2)(B)(iv). In either

event, Commerce is simply incorrect. CFA explicitly argued in its case brief that "all of [

                    ]" and [

                    ] CFA Case Brief at 12. And while CFA discussed these issues under the

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED    NON-CONFIDENTIAL VERSION

subheading "[                                        ]," CFA explained that the evidence regarding the [                                    ] was relevant to determining [        ] credibility and to the overall question of whether Co May's sale [        ] was *bona fide*. *See id.* at 12-13.

Crucially, not only did CFA argue that the record indicated that there was a relationship between [                                    ], and that this relationship was relevant to the *bona fide* sales analysis, Commerce *conceded* in its decision that such a relationship would be relevant to its analysis. IDM at 7-8. Commerce also addressed—though inadequately—CFA's arguments. Specifically, Commerce noted that there "was no explanation for" the fact that [                                    ] and that, absent "other information, it could weigh against a finding that Co May's unaffiliated customer made a true profit on the resale." *Id.* In other words, Commerce assessed CFA's argument about the [                                    ] under Section 1675(a)(2)(B)(iv)(V). Commerce's logic demonstrates that Commerce perfectly understood that CFA was not limiting its arguments regarding the [                                    ] to only one of the statutorily enumerated circumstances that Commerce must address in its *bona fide* analysis.

This situation is thus inapposite to that in *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990), which Defendant cites for the proposition that CFA failed to exhaust its argument regarding [                                    ], Def. Resp. at 17. In *Rhone*, the plaintiff argued before the Court that the agency should have updated data underlying the margin to account for changes in the relevant interest and exchange rates. 899 F.2d at 1191. The Court rejected the argument since the plaintiff never asserted it in the administrative proceedings. *Id.* The plaintiff "concede{d} that it never raised this *argument* before" for "tactical

reasons" but nevertheless "contend{ed that} it is simply another angle to an *issue* which it did raise." *Id.* (emphasis in original). Here, in contrast, CFA explicitly raised the argument that [                                    ] and that [        ] misrepresented that relationship to Commerce—thereby showing "that the sale at issue is not *bona fide.*" *See* CFA Case Brief at 12-13. Commerce was thus "put on notice of the issue" regarding [                                    ]. *Jacobi Carbons AB v. United States*, 222 F. Supp. 3d 1159, 1171 (Ct. Int'l Trade 2017) (cleaned up). "Accordingly, Commerce's exhaustion argument lacks merit." *Id.*

Defendant additionally argues that the [                                    ] is irrelevant to the *bona fide* analysis because the Act is only concerned with "sales between the producer/exporter and its U.S. customer." *See* IDM at 8; Def. Resp. at 18. But, again, Commerce itself conceded that [                                    ] was relevant to its *bona fide* analysis, because it "could weigh against a finding that Co May's unaffiliated customer made a true profit on the resale of the merchandise." IDM at 7-8; *see Jianxiang Yuanxin Import & Export Co. v. United States*, 71 F. Supp. 3d 1338, 1354 (Ct. Int'l Trade 2015) ("the relevant inquiry" for purposes of the *bona fide* analysis "is whether the exporter's U.S. customer made a profit."). Defendant's position is not merely *post-hoc*; it is inconsistent with the position taken by the agency it purports to defend.

**2.  Commerce has not adequately explained or supported the basis for its conclusion that [    ] and its downstream customers are unrelated.**

Defendant seeks to justify Commerce's determination that [    ] is not related to its downstream customers on the grounds that while "CFA provided two Wikipedia-style articles" to rebut Co May's documentation regarding the affiliations, Wikipedia is not reliable. *See* Def. Resp. at 18-19. But the referenced articles were not the only, or even the primary, source for CFA's positions. Rather, CFA asserted that [

BUSINESS PROPRIETARY INFORMATION
HAS BEEN DELETED    **NON-CONFIDENTIAL VERSION**

]. *See* CFA Case Brief at 12 (citing Letter from Wiley Rein LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Comments and Factual Information Regarding Co May's Supplemental Questionnaire Response* (Feb. 20, 2024), C.R. 381-383, P.R. 191, at Exhibit RFI-6).

Defendant additionally argues that substantial evidence supports Commerce's determination that the transactions between [    ] and certain of its customers was arms-length because [    ] resold to an additional customer with a different mailing address. Def. Resp. at 19. Commerce has yet to explain why this fact matters given that this resale customer [    ] as all of the others. *See* CFA Case Brief at 12; *see also* CFA's Opening Brief at 24.

Finally, the Defendant simply leaves unanswered CFA's contentions that Commerce failed to explain or support its characterization of certain record documents on which it relied in dismissing CFA's arguments regarding the [        ]. *Compare* Def. Resp. at 17-19 *with* CFA's Opening Brief at 23-25. Specifically, Commerce stated that it was giving weight to certain website data that [        ], and which the agency characterized as consistent with [        ] regarding its ownership. IDM at 7; *see also* Customer SQR at Exhibit 1 ([    ]) ([    ]'s statement [        ]). But the website data contains no information about [        ], and therefore cannot be consistent with [        ]. For that matter, the very same [    ] submission that contained the cited website data included, in a separate exhibit, a list of [    ] officers and employees. Letter from Mayer Brown LLP to Sec'y Commerce, re: *Certain Frozen Fish Fillets from Vietnam: Supplemental Section D Questionnaire Response – Part 2 (Questions 1, 23, 53,*

*57)* (Aug. 11, 2023) C.R. 209-369, P.R. 138-139, at Exhibit 1, Attachment D. This list not only indicated that [                                    ], the overall accuracy of the list is corroborated by email correspondence between Co May and [      ]. *Compare id. with* NSR Request at Exhibit 5.

Commerce's explanation regarding the relationship between [      ] and its customers is thus inadequately explained and supported. Rather, it "runs counter to the evidence," and fails to articulate a "rational connection between the facts found and the choice made." *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Accordingly, Commerce's determination must be remanded. *See id.*

## III.    <u>CONCLUSION</u>

In sum, Commerce failed to adequately explain or support its determination that Co May's sale price was typical, that Co May's customer sold Co May's product for a profit, and that there was no affiliation between [      ] and [                    ]. CFA accordingly respectfully requests that the Court remand Commerce's decision for further consideration of these issues.

Ct. No. 24-00126                                     NON-CONFIDENTIAL VERSION

Respectfully submitted:

*/s/ Nazak Nikakhtar*
Nazak Nikakhtar, Esq.
Maureen E. Thorson, Esq.
Stephanie M. Bell, Esq.

**WILEY REIN LLP**
2050 M Street NW
Washington, DC 20036
202-719-7000

*Counsel to the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc.*

Dated: March 14, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that these comments comply with the word limitation requirement. The word count for the Catfish Farmers of America's Reply Brief, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2019), is 5,003 words.

*/s/ Nazak Nikakhtar*
(Signature of Attorney)

Nazak Nikakhtar
(Name of Attorney)

Catfish Farmers of America, et al.
(Representative Of)

March 14, 2025
(Date)

1