Slip Op. 25-70

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CATFISH FARMERS OF AMERICA; AMERICA'S CATCH, INC.; ALABAMA CATFISH, LLC; CONSOLIDATED CATFISH COMPANIES, LLC; DELTA PRIDE CATFISH, INC.; GUIDRY'S CATFISH, INC.; HEARTLAND CATFISH COMPANY; MAGNOLA PROCESSING, INC.; SIMMONS FARM RAISED CATFISH, INC., <br><br>    Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br>    Defendant, | Before: Jane A. Restani, Judge <br><br> Court No. 24-00126 <br><br> **Public Version** |

**OPINION AND ORDER**

[Commerce's Final Results in the new shipper review of Commerce's antidumping duty order on certain frozen fish fillets from the Socialist Republic of Vietnam are sustained in part and remanded in part for reconsideration consistent with this opinion.]

Dated: June 5, 2025

Stephanie Manaker Bell, Wiley Rein, LLP, of Washington DC, argued for plaintiffs Catfish Farmers of America, et al. With her on the brief were Maureen Elizabeth Thorson and Nazakhtar Nikakhtar.

Kara Marie Westercamp, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for the defendant. Of counsel on the brief was Kenneth Garrett Kays, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

    **Restani, Judge:** Plaintiffs Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC, Consolidated Catfish Companies, LLC, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia

Processing, Inc., and Simmons Farm Raised Catfish, Inc. (collectively, "CFA"), challenge aspects of the decision of the United States Department of Commerce ("Commerce") in the new shipper review ("NSR") of the antidumping duty ("AD") order on certain frozen fish fillets from the Socialist Republic of Vietnam ("Vietnam"). <u>Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Final Results of Antidumping Duty New Shipper Review; 2022-2023</u>, 89 Fed. Reg. 53043 (Dep't Commerce June 25, 2024) ("<u>Final Results</u>"). CFA claims that Commerce improperly concluded that the single sale made by Vietnamese exporter Co May Import-Export Company Limited ("Co May") was <u>bona fide</u>. Confidential Mot. for J. on the Agency R. at 11, ECF No. 18 (Dec. 16, 2024) ("CFA Br."). For the following reasons, Commerce's <u>Final Results</u> are sustained in part and remanded in part for reconsideration consistent with this opinion.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c) and 19 U.S.C. § 1516a(a)(2). The court sustains Commerce's results of a NSR of an AD order unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence "is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Universal Camera Corp. v. NLRB</u>, 340 U.S. 474, 477 (1951) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)). More specifically, when reviewing substantial evidence challenges to Commerce's actions, the court assesses whether the agency action is "unreasonable" given the record as a whole. See <u>Nippon Steel Corp. v. United States</u>, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006).

Court No. 24-00126    Page 3
Public Version

Court No. 24-00126 　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Page 3
Public Version

## BACKGROUND

On August 12, 2003, Commerce published an AD order on certain[1] frozen fish fillets from Vietnam.[2] See Notice of Antidumping Duty Order: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 68 Fed. Reg. 47909 (Dep't Commerce Aug. 12, 2003) ("AD Order").  On February 14, 2023, Co May requested a NSR for the period of review ("POR") of August 1, 2022, through January 31, 2023.  See Letter from Mayer Brown LLP to Sec'y Commerce re: Certain Frozen Fish Fillets from Vietnam: Request for New Shipper Review – Co May Import Export Company Limited, C.R. 1 (Feb. 14, 2023) ("NSR Request").  In its submission, Co May certified that it is a producer and exporter of the subject merchandise covered by the NSR request, and that it did not export certain frozen fish fillets to the U.S. during the period of investigation.  Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Initiation of Antidumping Duty New Shipper Review, 88 Fed. Reg. 18520, 18520 (Dep't Commerce Mar. 29, 2023) ("NSR Initiation").  Co May reported making a single sale to the U.S. market during the five-month period covered by the review.  See Letter from Mayer Brown LLP to Sec'y Commerce re: Certain Frozen Fish Fillets

---

[1] The scope of the investigation covered "frozen fish fillets, including regular, shank, and strip fillets and portions thereof, whether or not breaded or marinated, of the species Pangasius Bocourti, Pangasisus Hypophthalmus . . . and Pangasisus Micronemus." Notice of Antidumping Duty Order: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, 68 Fed. Reg. 47909, 47909 (Dep't Commerce Aug. 12, 2003) ("AD Order").  The fillet products covered by the scope include boneless fillets with the belly flap intact and removed and boneless shank fillets cut into strips.  Id. Excluded from the scope are frozen whole fish, frozen steaks, and frozen belly-flap nuggets.  Id.
[2] In the AD Order, Commerce determined that certain frozen fish fillets from Vietnam were being sold at less than fair value.  AD Order at 47909.  Per the AD Order, Customs must require "at the same time as importers would normally deposit estimated duties on [certain frozen catfish fillets], a cash deposit equal to the estimated weighted-average antidumping duty margins."  Id.  The Vietnam-wide weighted-average dumping margin published in the AD Order is 63.88%.  Id. at 47910.

from Vietnam: Sec. C Questionnaire Response – Co May Import Export Company Limited at 39, C.R. 21–25 (May 5, 2023) ("Co May Section C Questionnaire Resp."). On March 23, 2023, Commerce initiated the NSR request. NSR Initiation.

On January 30, 2024, Commerce published its preliminary results of the NSR. Certain Frozen Fish Fillets From the Socialist Republic of Vietnam: Preliminary Results of New Shipper Review; 2022-2023, 89 Fed. Reg. 5862 (Dep't Commerce Jan. 30, 2024) ("Preliminary Results"). In the preliminary results, Commerce found that (1) Co May's sale of subject merchandise during the period of review was bona fide, and (2) Co May did not make sales of subject merchandise at prices below normal value. Preliminary Decision Memorandum accompanying Certain Frozen Fish Fillets from the Socialist Republic of Vietnam, P.R. 179 (Jan. 17, 2024) ("PDM"). Commerce imposed a zero-dollar antidumping duty margin as to Co May. Preliminary Results at 5826.

From April 1, 2024, through April 4, 2024, Commerce verified Co May's questionnaire responses through an on-site verification in Vietnam. Issues and Decision Memorandum accompanying Certain Frozen Fish Fillets from the Socialist Republic of Vietnam at 1–2, P.R. 211 (June 14, 2024) ("IDM"). On April 5, 2024, Commerce extended the deadline for issuance of the Final Results to June 14, 2024. Id. at 2. On May 17, 2024, CFA submitted its case brief. Id. On May 22, 2024, Co May submitted its rebuttal brief. Id. On May 30, 2024, Commerce held a public hearing. Id.

On June 14, 2024, Commerce issued the Final Results that were later published in the Federal Register on June 25, 2024. Final Results. In the Final Results, Commerce explained that it made some margin recalculations based on verification findings and review of the parties'

comments.³ Id. at 53044; IDM at 3. Commerce continued to calculate a dumping margin of zero dollars as to Co May. Final Results at 53044. In addition, Commerce continued to find that Co May made a bona fide sale of the subject merchandise during the POR. IDM at 4. In conducting its bona fide sales analysis, Commerce found that: (1) the timing of the sale did not indicate that it was not bona fide; (2) record evidence indicated that the price and quantity of the sale were commercially reasonable; (3) Co May did not incur any extraordinary expenses arising from the transaction; (4) Co May's unaffiliated U.S. customer provided documentation consistent with its statement that it made a profit on the resale of subject merchandise; and, (5) record evidence indicated that the sale was made between Co May and its unaffiliated U.S. customer at arm's-length. Id.

On August 23, 2024, CFA timely filed a complaint challenging the Final Results in this court. Compl., ECF No. 9 (Aug. 23, 2024).

## DISCUSSION

### I. New Shipper Reviews

Under Section 751(a)(2)(B) of the Tariff Act of 1930, "new shippers" can obtain their own individual dumping margin or countervailable subsidy rate on an expedited basis. 19 C.F.R. § 351.214(a). In general, a new shipper is an exporter or producer that did not export, and is not affiliated with an exporter or producer that did export, to the U.S. during the period of

---

³ Specifically, pursuant to verification findings, Commerce determined that (1) it would exclude fresh fish organs from Co May's by-product offset, (2) it would adjust the fish head and fat by-products component of Co May's by-product offset to reflect only the portion attributable to the merchandise under consideration, and (3) it would adjust Co May's domestic inland freight movement expenses and factor of product freight distances. IDM at 3.

investigation. Id. Once Commerce receives a NSR request, Commerce conducts a review "to establish an individual weighted average dumping margin or an individual countervailing duty rate" for such exporter or producer. 19 U.S.C. § 1675(a)(B)(i)(II). A NSR "enables a new shipper to demonstrate that it should be accorded a dumping rate specific to itself, and not the all-others rate . . . ." Hebei New Donghua Amino Acid Co. v. United States, 29 CIT 603, 604, 374 F. Supp. 2d 1333, 1335 (2005) (internal quotations and citation omitted). "[T]he ultimate goal of the new shipper review is to ensure that the U.S. price side of the antidumping calculation is based on a realistic figure . . . ." Tianjin Tiancheng Pharm. Co. v. United States, 29 CIT 256, 260, 366 F. Supp. 2d 1246, 1250 (2005).

To conduct a NSR, Commerce must determine the "normal value and export price (or constructed export price) of each entry of the subject merchandise[.]"[4] See 19 U.S.C. § 1675(a)(2)(A)(i). "Any weighted average dumping margin or individual countervailing rate . . . shall be based solely on the bona fide U.S. sales . . . made during the period covered by the review." Id. § 1675(a)(2)(B)(iv).

A sale is not bona fide when it is "commercially unreasonable" or "atypical of normal business practices." Tianjin, 29 CIT at 259, 366 F. Supp. 2d at 1249–50 (quotations omitted). "Accordingly, where a new shipper review is based on a single sale, exclusion of that sale as non-bona fide necessarily must end the review, as no data will remain on the export price side of

---

[4] "Dumping occurs when a foreign company sells a product in the U.S. for less than fair value – that is, for a lower price than in its home market." Midwest Fastener Corp. v. United States, 335 F. Supp. 3d 1355, 1357 (CIT 2018) (citation omitted). "Such sales, which permit foreign producers to undercut domestic companies by selling products below reasonable fair market value, amount to unfair competition with [U.S.] industry." HiSteel Co. v. United States, 653 F. Supp. 3d 1341, 1346 (CIT 2023).

Commerce's antidumping duty calculation." Id. at 259, 366 F. Supp. 2d at 1249.  In determining whether a company's sales are bona fide, Commerce weighs "the totality of circumstances," including such factors as (I) the prices of such sales; (II) whether such sales were made in commercial quantities; (III) the timing of such sales;[5] (IV) the expenses arising from such sales; (V) whether the subject merchandise involved in such sales was resold in the United States at a profit; (VI) whether such sales were made on an arm's-length basis; and (VII) any other factor the agency finds relevant as to whether such sales are, or are not, likely to be typical of those the exporter or producer will make after completion of the review.  19 U.S.C. § 1675(a)(2)(B)(iv). While a single sale is not inherently commercially unreasonable, it will be carefully scrutinized to ensure that new shippers do not unfairly benefit from unrepresentative sales.[6]  Tianjin, 29 CIT at 275, 366 F. Supp. 2d at 1263.

### II. Co May's Sale

Turning to the particular sale at issue here, CFA argues that Commerce's determination that Co May's sale to its U.S. customer ("Customer A")[7] was bona fide is unsupported by substantial evidence and otherwise not in accordance with law.  See CFA Br. at 11, 15.  CFA primarily challenges Commerce's Final Results on the grounds that Commerce did not adequately explain or support its conclusions that (1) Co May's single sale was reflective of normal commercial practices and likely future sales to the U.S. market, (2) Customer A's duty and non-

---

[5] Neither party could explain what would be dubious timing or expected timing.
[6] "[S]ingle sales, even those involving small quantities, are not inherently commercially unreasonable and do not necessarily involve selling practices atypical of the parties' normal selling practices."  Windmill Intern. PTE., Ltd. v. United States, 26 CIT 221, 231, 193 F. Supp. 2d 1303, 1313 (2002) (quotations and citations omitted).
[7] Co May's U.S. Customer is [[           ]].

Court No. 24-00126                                                                                                    Page 8
**Public Version**

duty expenses were reasonably considered in its resale price, and (3) Customer A was not affiliated with its downstream U.S. resale customers. Id. at 1–2, 15. The court will address each contention in turn.

### a. Substantial Evidence Supports Commerce's Determination that Co May's Sales Price was Within the Range of Typical Sales

CFA challenges Commerce's finding that Co May's sale to Customer A was typical of future pricing behavior for a number of reasons. Briefly listed, CFA's arguments on the atypicality of Co May's sale are that (1) Co May's single sale was at a price inconsistent with[8] sales of the subject merchandise in other markets during the POR, (2) Commerce failed to support or explain its rejection of Co May's third-country sales prices as a means of assessing typicality,[9] and (3) Co May's sales were made at a higher price than the average price of the other mandatory respondents in the POR-adjacent administrative review. See CFA Br. at 15–17.

As stated previously, a sale is not bona fide when it is "commercially unreasonable" or "atypical of normal business practices." Tianjin, 29 CIT at 259, 366 F. Supp. 2d at 1249–50 (quotations omitted). The ultimate goal of the new shipper review is to ensure that the U.S. price side of the antidumping calculation is based on a realistic figure. Id. at 260, 366 F. Supp. 2d at 1250. Commerce has "discretion to choose whatever methodology it deems appropriate, as long

---

[8] Co May's single sale was at a price [[           ]] than sales of the subject merchandise in other markets during the POR.

[9] The court agrees with Commerce that there is no requirement that the U.S. sales price be the same as a company's price to other markets. IDM at 8. Co May's overall sales during the POR had an average value of [[    ]]/kg in its home market and [[    ]]/kg in non-U.S. export markets. CFA Br. at 15. Commerce reasonably concluded that it is "plausible that different markets have different price points depending on different market conditions." IDM at 8–9.

as it is reasonable and its conclusions are supported by substantial evidence." Allied Tube & Conduit Corp. v. United States, 31 CIT 1090, 1094 (2007) (analyzing Commerce's use of a "range" methodology during a new shipper review).

In the Final Results, Commerce concluded that Co May's sale to Customer A was bona fide and likely to be typical of Co May's business practices after completion of the review. See IDM at 8. Commerce found that the sale was not a sample sale[10] because it was both for consideration and of a substantial quantity.[11] Id. Commerce also determined that Co May's sales price was commercially reasonable because it fell in the center of the distribution of the U.S. sales prices of the mandatory respondents in the POR-adjacent administrative review on a control number ("CONNUM")[12] specific basis.[13] Id. at 9. Finally, Commerce concluded that although Co May had not sold this particular CONNUM to other markets, it had produced and sold very similar CONNUMs in the ordinary course of its business, and thus, there was sufficient evidence on the record to make an inference about Co May's future pricing behavior. Id.

---

[10] Sample sales will be excluded from Commerce's calculations as outside of the ordinary course of trade. In order to conclude sales are "sample sales," Commerce typically requires information demonstrating the sales were not for consideration and not in commercial quantities. See Letter from Wiley Rein LLP to Sec'y Commerce, re: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Case Brief at 14–15, C.R. 405 (May 17, 2024).

[11] Commerce found, and CFA does not contest, that Co May's sales quantities were for several metric tons. IDM at 9; see AR Respondent's U.S. Sales Data at "CR 378 Bona Fide Entered Value Analysis: Comay-ENTVALUE", C.R. 409 (June 23, 2024) ([[   ]] kg is equal to [[   ]] metric tons).

[12] A control number or "CONNUM" is a number which identifies products which are unique with respect to a specified set of physical characteristics. IDM at 8 n.37.

[13] Co May and the mandatory respondents in the POR-adjacent 2021–2022 review followed the same general CONNUM system when reporting sales but assigned different code values to certain product characteristics. CFA Br. at 4 n.1. Though Co May and the mandatory respondents might have used different code values, the CONNUMs share identical physical characteristics. IDM at 9 n.44.

Court No. 24-00126 Page 10
**Public Version**

      Here, Commerce compared Co May's sales price to that of the mandatory respondents during an ongoing administrative review of the order, covering the period August 1, 2021, through July 31, 2022, to help determine whether Co May's sales price was commercially realistic.  IDM at 4–5.  Commerce explained that it compared Co May's sales price to the mandatory respondents from the POR-adjacent administrative review because it was the "most contemporaneous respondent database available" at the time because the initial data submission for the August 1, 2022, through July 31, 2023, POR was not available until May/June of 2024.  Confidential Resp. to Pl.'s Mot. for J. on the Agency R. at 13, ECF No. 20 (Feb. 12, 2025) ("Gov. Resp.").  The two mandatory respondents, Vinh Hoan Corporation ("VHC") and Can Tho Import Export Seafood Joint Stock Company ("CASEAMEX"), collectively sold a large volume[14] of the relevant CONNUM to the U.S. market during the 2021–2022 POR.  CFA Br. at 5.  The total entered value of Co May's sales was a small percentage of mandatory respondents' sales value and the net quantity was equally small.[15]  Gov. Resp. at 12; CFA Br. at 12, 15.  From this evidence, Commerce determined that Co May's sales price[16] was consistent with sales prices charged by other exporters of the subject merchandise from Vietnam in a proximate period to the time of sale.  IDM at 4–5.

---

[14] The two mandatory respondents collectively sold [[      ]] kgs of the relevant CONNUM to the U.S. market during the 2021–2022 POR for [[      ]], at an average unit price of [[    ]]/kg.  CFA Br. at 5.  Specifically, the U.S. prices of the mandatory respondents were [[    ]]/kg for VHC and [[    ]]/kg for CASEAMEX.  Id. at 5–6 n.2.

[15] The total entered value of Co May's sales was [[     ]] and the net quantity was [[     ]]/kg.  Gov. Resp. at 12.  Co May's unit price was [[   ]]/kg.  CFA Br. at 15.

[16] CFA points out that Customer A was required to deposit $2.39/kg of antidumping duties on Co May's merchandise, while the mandatory respondents in the 2021–2022 review were subject to a $0.00–0.15 deposit rate during the new shipper review.  CFA Br. at 14.  The duty-inclusive price of Co May's subject merchandise was [[    ]]/kg.  Id. at 17–18.

Commerce further determined that "the market could sustain [Co May's] pricing practice for this particular variety of merchandise." Id. at 9.

As previously stated, Commerce has latitude in deciding what methodology to use when determining whether a sale is commercially reasonable. See Allied Tube & Conduit Corp., 31 CIT at 1094. Here, it was reasonable for Commerce to compare Co May's average unit price to that of the other mandatory respondents in the POR-adjacent administrative review. Based on that comparison, it was reasonable for Commerce to find that Co May's sale was not made at a higher price than the average sales price of the mandatory respondents in the POR-adjacent administrative review. It was reasonable for Commerce to use the normal duty-exclusive price of Co May's subject merchandise when the mandatory respondents were only subject to a $0.00–.15 deposit rate. The court further concludes that Commerce's finding that Co May's sales price was typical because it fell within the average sales price range of the mandatory respondents was reasonable. Commerce considered the price of Co May's sales in comparison to those of the mandatory respondents in the POR-adjacent administrative review; Commerce reasonably found Co May's sales price to not be aberrational as it fell within the normal range of prices of said mandatory respondents.

### b. Substantial Evidence Supports Some of Commerce's Determinations as to Expenses of Customer A Affecting the Resale Price

The dispute in this case largely revolves around whether the sale at issue should be viewed as a profitable one. That question depends in part on what expenses are considered. CFA argues Commerce failed to explain or support its decision not to include antidumping duty deposits as a cost when it assessed the profitability of the resale of Co May's goods. CFA Br. at 18–21.

Court No. 24-00126                                                                                                   Page 12
**Public Version**

Additionally, CFA contests Commerce's conclusion that Customer A's reported non-duty expenses were complete and accurate. Id. at 21–22. These deficiencies in Commerce's analysis, CFA claims, led to its erroneous finding that the resale of Co May's goods was profitable. Id. at 22–23. The government responds that Commerce correctly ignored duty deposits when accounting for profit as such duties are "uncertain" and are not expenses that should be deducted from overall price. Gov. Resp. at 14–15. Regarding non-duty expenses, the government asserts that there is no evidence that Customer A failed to report any of the expenses associated with the resale of Co May's merchandise.[17] Id. at 16. The government concludes that, on balance, the resale of Co May's goods was profitable and therefore indicative of its future commercial practice. See id. at 6, 16.

When determining whether a sale is commercially reasonable, and thus bona fide, Commerce considers whether the subject merchandise involved in such a sale was resold in the United States at a profit. See 19 U.S.C. § 1675(a)(2)(B)(iv)(V). Resale profitability is one factor Commerce considers under the totality of the circumstances in a bona fide sale analysis. See Tianjin, 29 CIT at 267–68, 366 F. Supp. 2d at 1257. Commerce has found instances where goods are resold at a loss to be suggestive of commercial unreasonableness, see, e.g., Windmill Int'l PTE., Ltd. v. United States, 26 CIT 221, 225, 228–31 (2002).

Here, Co May sold [[      ]] of frozen fish fillets to Customer A at a price of [[      ]], for a total value of [[      ]]. Preliminary Results at 1. As the importer, Customer A paid an antidumping duty deposit at the Vietnam-wide rate of $2.39 per kg, amounting to a total of [[

---

[17] The government cites to Commerce's satisfaction with the provided aggregate figure of [[      ]] non-duty expenses, amounting to [[      ]] of the total resale value. Gov. Resp. at 15.

Court No. 24-00126														Page 13
**Public Version**

]].  CFA Br. at 19.  Commerce did not include this duty deposit in its profit calculation.  See IDM at 5 ("[J]ust as in the context of dumping calculations, such deposits (which are estimates of an uncertain duty liability to be assessed in the future) are not part of Commerce's analysis, and adjusting for deposits of estimated duties, which may be fully refunded, would run contrary to Commerce's longstanding practice.").  Customer A also incurred other expenses in obtaining and reselling the merchandise in the amount of [[        ]].[18]  CFR Br. at 19.  Customer A resold the goods to various grocery stores for a total of [[    ]], realizing a profit of [[    ]], duty deposit excluded.  Id.; Letter from Mayer Brown LLP to Sec'y Commerce, re: Certain Frozen Fish Fillets from Vietnam: Unaffiliated Customer Supplemental Questionnaire, at Ex. 1, Attach. A, C.R. 380 (Feb. 8, 2024) ("Supp. Questionnaire Resp.").

      CFA insists that Commerce should have included the [[    ]] duty deposit in its profit calculation—if it had done so, Customer A would have resold its goods at a loss.  See CFA Br. at 6.  The government maintains that Commerce correctly followed its longstanding practice of choosing not to include duty deposits as expenses generally incurred because of their "intangibility."  Gov. Resp. at 14–15 (citing Xanthan Gum from the People's Republic of China: Rescission of 2014-2015 Antidumping Duty New Shipper Review, 81 Fed. Reg. 56586 (Dep't Commerce Aug. 22, 2016)).  Commerce chose not to include duty deposits, which are estimates of a hypothetical future payment that may be ultimately refunded, when it assessed the profitability of Customer A's resale.  See id. ("[Commerce] does not adjust for cash deposit rates when

---

[18] As part of this overall figure, Customer A reported its incurred Selling, General, and Administrative Expenses ("SG&A") to be [[    ]].  Letter from Mayer Brown LLP to Sec'y Commerce, re: Certain Frozen Fish Fillets from Vietnam: Unaffiliated Customer Supplemental Questionnaire, at Ex. 1, Attach. A, C.R. 380 (Feb. 8, 2024) ("Supp. Questionnaire Resp.").

Court No. 24-00126                                                                                                Page 14
**Public Version**

calculating net prices in its price comparisons . . . cash deposits of antidumping duties are not expenses that we should deduct from U.S. price."). Indeed, Co May was ultimately assessed a weighted-average dumping margin of zero. Final Results at 53044. Neither party has explained well why Commerce should or should not deduct duties in evaluating profitability, quite apart from its antidumping duty calculation. While the country-wide duty deducted in Xanthan Gum, see 81 Fed. Reg. 56586, was over one hundred percent, the duty here was also substantial, though smaller. Commerce should explain whether it considers the likelihood that this importer would expect that its actual rate would be lower, so that the sale at the reduced rate would likely be bona fide. If Commerce performs no such particularized analysis, it should explain why or provide such analysis here.

In addition to an antidumping duty deposit, Customer A also reported non-duty expenses at Commerce's request. See supra n.18; Supp. Questionnaire Resp. at Ex. 1, Attach. A. Customer A provided a "lump sum" figure of [[     ]] of "Selling, General, and Administrative [("SG&A")] Expenses Incurred." Supp. Questionnaire Resp. at Ex. 1, Attach. A. CFA argues this value was not "supported by any documentary evidence." CFA Br. at 21. CFA also asserts Commerce did not engage with record evidence[19] of purported "freight-to-customer" expenses that would

---

[19] CFA provided Commerce with screenshots from publicly available websites to support their argument that Customer A's SG&A expenses were higher than Customer A reported in its supplemental questionnaire responses. See Letter from Wiley Rein LLP to Sec'y Commerce, re: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Comments and Factual Information Regarding Co May's Supplemental Questionnaire Response, Exs. RFI-3B, RFI-3C, RFI-4A, RFI-4B, C.R. 381-383 (Feb. 20, 2024) ("Comments on Supp. Questionnaire Resp."). These screenshots consist of GoogleMaps directions that outline the distances between Customer A and its resale costumers, see RFI-3B, a website that converts kilometers to miles, see RFI-3C, an article on flatbed hauling services, see RFI-4A, and an article on trucking rates in 2022, see RFI-4B.

Court No. 24-00126                                                                                                    Page 15
**Public Version**

hypothetically go beyond the reported [[    ]] value.  Id. at 21–22.  Commerce disagreed and found "no basis to conclude the customer failed to report any of the expenses associated with its resale of Co May's fish."  IDM at 6.  Commerce accepted this "lump sum" figure of non-duty expenses as reported by Co May, without requiring further "reconciliation."  Id.  Customer A explained that in its normal course of business it costs out its SG&A expenses at [[    ]] of sales, as it did here.  Supp. Questionnaire Resp. at Ex. 1, Attach. A.  Commerce can request supplemental information regarding non-duty expenses if it so requires.  Here, however, Commerce was satisfied with Customer A's submission of non-duty expenses and concluded that the information provided was reliable.[20]  See IDM at 6–7.  There is no allegation of an unacceptable investigation by Commerce; the court concludes Commerce's decision as to non-duty expenses was substantially supported.

### c. Substantial Evidence Does Not Support Commerce's Determination that the Relationship between Customer A and its Resale Customers did not Impact Co May's Bona Fide Sale

Finally, CFA argues that Commerce did not adequately explain or support its conclusion that Customer A and its downstream customers were unaffiliated and therefore the sale was bona fide.  CFA Br. at 23.  CFA argues that record evidence indicates that Customer A sold the product it obtained from Co May to parties that were related to each other, despite initially reporting

---

[20] There is no evidence in the record to show that Commerce erred in its analysis of Customer A's SG&A expenses.  The court notes, however, that Commerce is unable to fully compare Customer A's SG&A expenses to CFA's hypothetical breakdown of "freight-to-customer" expenses where the supplemental questionnaire allows for a lump sum.  For a more robust analysis of Customer A's SG&A expenses, Commerce would need more detailed information.

otherwise. Id. at 7. CFA points to filing statements in the record to support this argument. Letter from Wiley Rein LLP to Sec'y Commerce, re: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Comments and Factual Information Regarding Co May's Supplemental Questionnaire Response at Ex. RFI-6, C.R. 381–383 (Feb. 20, 2024) ("Comments on Supp. Questionnaire Resp."). CFA compared Customer A's filing statement with the filing statements of each of its downstream customers.[21] CFA Br. at 23–24. From that comparison, CFA determined that (1) Customer A and all but one of its downstream customers share the same mailing address, (2) the shared mailing address is the same mailing address associated with the CEO of Customer A ("CEO A"), (3) each downstream customer had the same CEO ("CEO B"), and (4) CEO B is listed as an employee of Customer A.[22] Id.

CFA further argues that Commerce should have considered this evidence as part of its bona fide sales analysis. CFA Br. at 23. Under the "any other factor" prong, CFA argues that Commerce should have considered Customer A's affiliation with its downstream customers as evidence that might weigh against Commerce's finding of profitability of the resale of the subject merchandise in the U.S. market. See id.

The government counters that the "arms-length" provision in the statute requires Commerce to determine affiliation as it relates to sales between Co May and Customer A, not the affiliation between Customer A and its downstream customers. IDM at 7; Gov. Resp. at 18; see

---

[21] Customer A sold the merchandise to [[                                                       ]]. CFA Br. at 7; Comments on Supp. Questionnaire Resp. at Ex. RFI-6.
[22] CEO A is [[      ]]. Comments on Supp. Questionnaire Resp. at Ex. RFI-6. CEO B is [[ ]]. Id. The corporate mailing address on all but one of CEO B's businesses matched the corporate mailing address for Customer A. Id.

Court No. 24-00126                                                                                         Page 17
**Public Version**

NSR Request at Ex. 2. The government further argues that the record does not demonstrate an affiliation between Customer A and its downstream customers.[23] Gov. Resp. at 17. Commerce acknowledged that the mailing address of Customer A and the mailing addresses of many of its downstream customers appear to be the same. See IDM at 7. Commerce, however, determined that Customer A had non-affiliate sales because one downstream customer did not share the same mailing address. Commerce seems to ignore that the downstream customer with a different mailing address had the same CEO, CEO B, as all the other downstream customers when it made this determination. Commerce went on to explain that it "agree[s] with [CFA] that there is no explanation for [the shared mailing address], and, in the absence of other information, it could weigh against a finding that Co May's unaffiliated customer made a true profit on the resale of the merchandise." Id. at 7–8. Commerce, however, concluded that "neither the information regarding ownership nor the identified addresses compel a modification to [its] preliminary analysis" that Co May's sale was bona fide. Id. at 8.

      The court agrees with Commerce that there is nothing in the plain language of the statute that requires Commerce to consider the relatedness of the unaffiliated U.S. customer and its downstream customers.[24] See 19 U.S.C § 1675(a)(2)(B)(iv). The court, however, agrees with

---

[23] The government argues that Commerce was reasonable in concluding that there was no affiliation between Customer A and its resale customers because it chose not to rely on the "Wikipedia-style articles" CFA submitted to show that Customer A misrepresented its ownership. Gov. Resp. at 18; IDM at 7. Commerce explained that it reasonably credited the documentation submitted by Co May sourced from Customer A's website on company ownership rather than these "Wikipedia-style articles." IDM at 7.

[24] The statute only requires Commerce to consider whether the sale(s) "of an exporter or producer made during the period covered by the review were bona fide" by considering various factors, including whether "such sales were made on an arms-length basis." See 19 U.S.C. § 1675(a)(2)(B)(iv). The court further agrees with the parties that, whether or not downstream

Court No. 24-00126 Page 18
Public Version

CFA that under these facts, Commerce should have considered the affiliation between Customer A and its downstream customers as part of its profitability analysis. The court struggles to understand how resale profitability for the importer can be determined reliably where the downstream sales are between an importer and related entities. The court also concludes that Commerce erred when it found that there was no substantial evidence to support CFA's contention that Customer A was affiliated with its downstream customers. The court remands to Commerce to decide how profitability should be determined when the unaffiliated U.S. customer is closely affiliated with its downstream customers.

## CONCLUSION

For the foregoing reasons, the court sustains in part and remands in part Commerce's <u>Final Results</u> for a determination consistent with this opinion. Commerce must reconsider and fully explain the profitability analysis underlying its determination that the single sale at issue was <u>bona fide</u>, addressing both antidumping duty expenses and sales between likely affiliated parties. The remand determination shall be issued within 90 days hereof. Comments may be filed 30 days thereafter and any response 15 days thereafter.

/s/ Jane A. Restani
Jane A. Restani, Judge

Dated: June 5, 2025
      New York, New York

---

customers are affiliated with Customer A, there is nothing on the record that indicates affiliation between Co May and Customer A. <u>IDM</u> at 7.