A-552-801
Remand
Slip Op 25-70
POR: 08/01/2022 – 01/31/2023
~~Proprietary Document~~
E&C/OV: JB

*Public Version*

**Catfish Farmers of America, et. al. v. United States**
**Ct. No. 24-00126, Slip Op. 25-70 (CIT June 5, 2025)**
**Certain Frozen Fish Fillets from the Socialist Republic of Vietnam**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

## I.    SUMMARY

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination in accordance with the opinion and remand order of the U.S. Court of International Trade (the Court) in *Catfish Farmers of America, et. al. v. United States*, Ct. No. 24-00126; Slip Op. 25-70 (CIT June 5, 2025) (*Remand Opinion and Order*). These final results of redetermination concern the *Final Results* in the new shipper review (NSR) of the antidumping duty order on certain frozen fish fillets from the Socialist Republic of Vietnam (Vietnam)[1] covering the period of review (POR) August 1, 2022, through January 31, 2023.[2]

In the *Remand Opinion and Order*, the Court found several aspects of Commerce's *Final Results*, in which we determined that Co May Import-Export Company Limited (Co May) made a *bona fide* sale of subject merchandise during the POR, to be supported by substantial evidence, but remanded for further consideration other aspects of our determination.[3] Specifically, the Court remanded for further explanation or reconsideration: (1) Commerce's determination that

---

[1] *See Notice of Antidumping Duty Order: Certain Frozen Fish Fillets from the Socialist Republic of Vietnam*, 68 FR 47909 (August 12, 2003) (*Order*).
[2] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam: Final Results of Antidumping Duty New Shipper Review; 2022-2023*, 89 FR 53043 (June 25, 2024) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See Remand Opinion and Order*.

antidumping duty (AD) cash deposits should not be included in determining the profitability of the resale of Co May's merchandise;[4] and (2) the relevance of certain indicia of affiliation between Co May's customer (*i.e.*, Customer A) and its downstream customers as part of its profitability analysis.[5]  Below, we provide further discussion of these issues, consistent with the *Remand Opinion and Order*.  As a result of this additional analysis, we have reconsidered our determination that Co May's single sale of subject merchandise is *bona fide,* and we now determine that it is not *bona fide*.

## II.     BACKGROUND

### Commerce's Findings

On January 30, 2024, Commerce published the *Preliminary Results* of this NSR and invited interested parties to comment.[6]  In the *Preliminary Results*, Commerce stated:

> Based on the totality of the circumstances and the factors listed in section 751(a)(2)(B)(iv) of the {Tariff Act of 1930, as amended (the Act)}, we preliminarily find that Co May's sale of subject merchandise during the POR was made on a *bona fide* basis.  Specifically, we preliminarily find that:  (1) the timing of the sales does not indicate that the sale might not be *bona fide*; (2) record evidence indicates that the price and quantity of the sale are commercially reasonable; (3) Co May did not incur any extraordinary expenses arising from the transactions; (4) Co May's unaffiliated U.S. customer provided documentation demonstrating that it potentially made a profit on the resale of subject merchandise to unaffiliated U.S. customers; and (5) record evidence indicates that the sale was made between Co May and its unaffiliated U.S. customer at arm's length. Therefore, we preliminarily find that Co May's sale of subject merchandise to the United States was *bona fide* for the purposes of this NSR.[7]

Having determined that the sale was *bona fide*, Commerce calculated an individual weighted-average dumping margin of $0.00/kg for Co May.[8]

---

[4] *See Remand Opinion and Order* at 11-15.
[5] *Id*. at 15-18.
[6] *See Certain Frozen Fish Fillets from the Socialist Republic of Vietnam:  Preliminary Results of New Shipper Review; 2022-2023*, 89 FR 5862 (January 30, 2024) (*Preliminary Results*), and accompanying Preliminary Decision Memorandum (PDM).
[7] *See Preliminary Results* PDM at 4 (internal citations omitted).
[8] *See Preliminary Results*.

From April 1 through 4, 2024, Commerce verified the questionnaire responses of Co May in Vietnam.[9]  On May 17, 2024, the petitioners[10] submitted a case brief.[11]  On May 22, 2024, Co May submitted a rebuttal brief.[12]

On June 25, 2024, Commerce published the *Final Results*.[13]  In the *Final Results* IDM, Commerce stated:

> For the reasons stated, based on the factors listed in section 751(a)(2)(B)(iv) of the Act and the totality of the circumstances surrounding Co May's sale of subject merchandise during the POR, we find that the sale underlying this NSR was made on a *bona fide* basis.[14]

With respect to one such factor – *i.e.*, "whether the subject merchandise involved in such sales was resold in the United States at a profit" – we found that Customer A resold the merchandise at a profit.[15]  In this regard, we did not treat Customer A's AD cash deposit as an expense when considering whether the resale was profitable, noting that:  (i) Commerce excludes such cash deposits from its margin calculations, and (ii) the cash deposit could be refunded in whole or in part.[16]

Additionally, we determined that the relationship between Customer A and its downstream customers did not undermine our determination regarding profitability, despite the fact that the record was unclear regarding the potential affiliation between Customer A and all of its downstream customers.  While we acknowledged that Commerce found that Customer A

---

[9] *See* Memorandum, "Verification of the Questionnaire Responses of Co May Import-Export Company Limited in the New Shipper Review of Certain Frozen Fish Fillets from the Socialist Republic of Vietnam," dated May 8, 2024.
[10] The petitioners are the Catfish Farmers of America and individual U.S. catfish processors America's Catch, Inc., Alabama Catfish, LLC d/b/a Harvest Select Catfish, Inc., Consolidated Catfish Companies, LLC d/b/a Country Select Catfish, Delta Pride Catfish, Inc., Guidry's Catfish, Inc., Heartland Catfish Company, Magnolia Processing, Inc. d/b/a Pride of the Pond, and Simmons Farm Raised Catfish, Inc.
[11] *See* Petitioners' Letter, "Case Brief," dated May 17, 2024.
[12] *See* Co May's Letter, "Rebuttal Brief of Co May Import Export Company Limited," dated May 22, 2024.
[13] *See Final Results*.
[14] *See Final Results* IDM at Comment 1.
[15] *Id*.
[16] *Id*.

shared a mailing address with some of its customers, we also found that this was not the case for all of its customers.[17]

In the *Final Results*, Commerce continued to calculate an individual weighted-average dumping margin of $0.00/kg for Co May.[18]

### Remand Opinion and Order

In the *Remand Opinion and Order*, the Court remanded two aspects of Commerce's *Final Results*. First, the Court remanded for further explanation Commerce's determination as to why Commerce should, or should not, deduct AD cash deposits in evaluating profitability of the resale (*i.e.*, Customer A's sale to downstream customers).[19] Furthermore, the Court stated that Commerce should explain whether it considers the likelihood that the importer (here, Customer A) would expect that its actual AD duties would be lower than its estimated AD duties, such that the sale at the reduced rate would likely be *bona fide*.[20] The Court directed that, if Commerce performs no such particularized analysis, Commerce should explain why or provide such analysis here.[21]

Second, the Court remanded Commerce's determination that the relationship between Customer A and its resale customers did not undermine Commerce's finding that Co May's sale was profitable.[22] The Court stated that Commerce should have considered the affiliation between Customer A and its downstream customers as part of its profitability analysis regarding the resale of subject merchandise in the United States.[23] The Court also concluded that Commerce erred when it found that there was no substantial evidence to support the petitioners'

---

[17] *Id.*
[18] *See Final Results*.
[19] *See Remand Opinion and Order* at 14.
[20] *Id.*
[21] *Id.*
[22] *Id* at 15.
[23] *Id* at 17-18.

contention that Customer A was affiliated with its downstream customers.[24]  Thus, the Court remanded to Commerce to decide how profitability should be determined when the unaffiliated U.S. customer is affiliated with its downstream customers.[25]

On August 22, 2025, Commerce issued its Draft Results.[26]  Therein, we stated that the Court's concern regarding Customer A's affiliation with its customers, and the cash deposits it was required to post, did not alter our resale profitability analysis.  Regarding affiliation, we found that the data on the record was adequate to demonstrate that Co May's price was reasonable, even if we did not have resale data relating to transactions between unaffiliated parties.[27]  Regarding cash deposits, we stated that these expenses should not be considered in the context of assessing profitability, akin to Commerce's treatment of such expenses in a margin calculation.[28]  On August 28, 2025, the petitioners submitted comments on the Draft Results.[29]

Based on comments received from the petitioners, and upon further consideration of the record evidence in this NSR, Commerce has modified its *bona fide* analysis and finds that Co May's sale was not *bona fide.*  Accordingly, the "Analysis" section below has been revised from the Draft Results.

## III.    ANALYSIS

In NSRs, Commerce analyzes whether U.S. sales are *bona fide* under section 751(a)(2)(B)(iv) of the Act. This provision states:

> (iv)    Determinations Based on *Bona Fide* Sales – Any weighted average dumping margin or individual countervailing duty rate determined for an exporter or producer in a review conducted under clause (i) shall be based

---

[24] *Id.*
[25] *Id*.
[26] *See* Draft Results of Redetermination Pursuant to Court Remand, *Catfish Farmers of America, et al. v. United States*, Ct. No. 24-00126, Slip Op. 25-70 (CIT June 5, 2025), issued August 22, 2025 (Draft Results).
[27] *Id*. at 11-12.
[28] *Id*. at 8-9.
[29] *See* Petitioners' Letter, "Comments on Draft Results of Redetermination," dated August 28, 2025 (Petitioners Comments).

solely on the *bona fide* United States sales of an exporter or producer, as the case may be, made during the period covered by the review.  In determining whether the United States sales of an exporter or producer were *bona fide*, the administering authority shall consider, depending on the circumstances surrounding such sales –

(I)     the prices of such sales;
(II)    whether such sales were made in commercial quantities;
(III)   the timing of such sales;
(IV)    the expenses arising from such sales;
(V)     whether the subject merchandise involved in such sales was resold in the United States at a profit;
(VI)    whether such sales were made on an arm's-length basis; and
(VII)   any other factor {it} determines to be relevant as to whether such sales are, or are not, likely to be typical of those the exporter or producer will make after the completion of the review.[30]

In our *Final Results*, we considered the above statutory criteria when assessing the *bona fide* nature of Co May's reported U.S. sale and found that the totality of the circumstances supported a finding that Co May's sale was *bona fide*.[31]  The Court found various aspects of our analysis were supported by substantial evidence but remanded for reconsideration the ultimate finding that the sale was *bona fide*.

In remanding our *bona fide* analysis, the Court identified two issues with Commerce's reasoning, both concerning the profitability of Customer A's resale of the merchandise purchased from Co May in this NSR.  First, the Court directed that we consider whether Customer A's cash deposit reflected a cost that impacted the potential profitability of its resale; specifically, the Court directed Commerce to "explain whether it considers the likelihood that {Customer A} would expect that its actual rate would be lower {than the cash deposits of AD duties}" or "{if Commerce performs no such particularized analysis, it should explain why."[32] Second, the Court directed Commerce to "decide how profitability should be determined when

---

[30] *See* section 751(a)(2)(B)(iv) of the Act.
[31] *See Final Results* IDM at Comment 1.
[32] *See Remand Opinion and Order* at 14.

the unaffiliated U.S. customer is closely affiliated with its downstream customers."[33]  We

address these issues, in turn.

### A.  Treatment of Cash Deposits

The Court directed Commerce to provide further explanation of whether Commerce

should, or should not, account for AD cash deposits in evaluating the profitability of the resale(s)

in question.[34]  Specifically, the Court held:

> Commerce chose not to include duty deposits, which are estimates of a hypothetical
> future payment that may be ultimately refunded, when it assessed the profitability
> of Customer A's resale. . . Neither party has explained well why Commerce should
> or should not deduct duties in evaluating profitability, quite apart from its
> antidumping duty calculation.  While the country-wide duty deducted in *Xanthan
> Gum {from the People's Republic of China:  Rescission of 2014-2015 Antidumping
> Duty New Shipper Review, 81 FR 56586 (August 22, 2016) (Xanthan Gum from
> China)}*, was over one hundred percent, the duty here was also substantial, though
> smaller.  Commerce should explain whether it considers the likelihood that this
> importer would expect that its actual rate would be lower, so that the sale at the
> reduced rate would likely be <u>bona fide</u>.  If Commerce performs no such
> particularized analysis, it should explain why or provide such analysis here.[35]

The Act requires Commerce to determine "whether the subject merchandise involved in

{the NSR} sales *was resold* in the United States at a profit."[36]  As part of that analysis,

Commerce must consider the expenses incurred by Customer A to determine whether the resale

was profitable.  Although Commerce considered various expenses in conducting this analysis in

the underlying NSR, we find that a revision to our Draft Remand approach is warranted as it

relates to Customer A's cash deposit expense based on a review of the record and interested

party comments.

---

[33] *Id*. at 18.
[34] *Id*.
[35] *Id*.
[36] *See* section 751(a)(2)(B)(iv)(V) of the Act (emphasis added).

As we stated in the *Final Results*, Commerce has a long-standing practice of not deducting cash deposits in its dumping margin analysis.[37]  This practice has been affirmed by the U.S. Court of Appeals for the Federal Circuit  (Federal Circuit), which has found that "{a}ntidumping duties cannot be subtracted in the calculation of dumping margins (and hence antidumping duties), because doing so would produce a spiraling circularity,"[38] and also found that "{w}e conclude that Commerce's refusal to deduct antidumping duties when calculating {export price} reflects a permissible construction" of the Act.[39]  Here, however, the Court held that "{n}either party has explained well why Commerce should or should not deduct duties in evaluating profitability, *quite apart from its antidumping duty calculation*."[40]  Upon further consideration, we find that cash deposits may appropriately be considered in the context of *bona fides* analysis.

The "circularity" problem that is present when deducting duties in a margin calculation— *i.e.*, ignoring the remedy that has already been provided in determining the necessary remedy to be provided in the future—is not present here.  The question before us is not whether the sale is dumped; rather, the question is a more fundamental one – whether the sale itself is a legitimate sale which is "likely to be typical of those the exporter or producer will make after completion of the review"[41] or whether, instead, the sale was made for the one-time purpose of establishing a favorable cash deposit rate, which has limited predictive power over future sales by this company.  In this context, we find that the existence of a cash deposit of estimated dumping

---

[37] *See, e.g.*, *Xanthan Gum from China* IDM at Comment 2 ("We also disagree with IMJ's contention that {Commerce's} comparisons should consider dumping and cash deposit rates. {Commerce} does not adjust for cash deposit rates when calculating net prices in its price comparisons. … There is no reason for {Commerce} to depart from its practice here and IMJ has cited no precedent as evidence of past {Commerce} practice in this regard.").
[38] *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 63 F.4th 25, 35 (2023) (*Borusan*).
[39] *See APEX Exports v.* United States, 777 F.3d 1373, 1380 (2015) (*Apex*).
[40] *See Remand Opinion and Order* at 14 (emphasis added).
[41] *See* section 751(a)(2)(B)(iv)(VII) of the Act.

duties is not only a relevant, but also a necessary, consideration when evaluating Customer A's business decision to source subject merchandise covered by this order.

Here, Co May's U.S. customer was required to post a substantial cash deposit in deciding to make a purchase of subject merchandise from Co May.[42]  Further, the refund of such a deposit is not guaranteed, and, thus, the importer could not know with certainty at the time of importation that it would receive a refund (either in full or in part) of those deposits, given the range of potential outcomes of the NSR.  In this regard, the eventual dumping margin is a function of many decisions that are based on the comments and factual submissions of interested parties, including:  whether a separate rate is granted; selection of a surrogate country; selection of surrogate values; treatment of potential adjustments/offsets to U.S. price and normal value; whether a party fully cooperated; *etc*.  Many of these factors are beyond the control of individual customers, and much of the information that determines whether a supplier will be given an individual rate, and what that rate will be, are unknown to the customer at the time of the sale. Thus, when Customer A posted its cash deposit, there was substantial risk associated with sourcing from Co May, whose prevailing cash deposit rate was the Vietnam-wide entity rate.[43] This risk constitutes a commercially significant consideration for Customer A which should be considered in determining whether the underlying sale was *bona fide*.

Further, regardless of the amount of a potential refund of Customer A's deposit, the importer/customer's substantial deposit of dumping duties had a real-time impact on Customer A's cash flow, which is both a valid, and a reasonable, consideration when analyzing whether Customer A resold the fish at profit to unaffiliated customers.  In particular, a company's outlay

---

[42] *See* Co May's Letter, "Request for New Shipper Review – Co May Import Export Company Limited," dated February 14, 2023, at Exhibit 3.
[43] *Id*.

of funds reflects a cost to the U.S. customer and, in other contexts, Commerce considers the time value of money in its analysis.[44]  Here too, the expenses associated with such an outlay are business expenses that have implications for whether Customer A's resale of the imported merchandise is likely to be profitable.

Accordingly, we find that, in the context of analyzing resale profitability in a *bona fide* analysis, it is appropriate to consider AD cash deposits in the manner discussed above. Specifically, we find that the presence of uncertain and potentially large expenses (*i.e.*, the amount of duties to be eventually assessed) and the unavoidable expenses (*i.e.*, costs associated with the upfront financial outlay) associated with posting a cash deposit call into question whether Customer A's resales would eventually be made at a profit.  This determination weighs against finding Co May's sale to be *bona fide*.

### B. Relationship of Co May's Customer with its Downstream Customers

The Court also remanded Commerce's analysis regarding the relationship between Customer A and its resale customers and directed Commerce to consider further how the relationship would impact the resale profitability analysis for examining the *bona fides* of Co May's sale.  Specifically, the Court stated:

> {t}he court, however, agrees with CFA that under these facts, Commerce should have considered the affiliation between Customer A and its downstream customers as part of its profitability analysis.  The court struggles to understand how resale profitability for the importer can be determined reliably where the downstream sales are between an importer and related entities.  The court also concludes that Commerce erred when it found that there was no substantial evidence to support CFA's contention that Customer A was affiliated with its downstream customers. The court remands to Commerce to decide how profitability should be determined when the unaffiliated U.S. customer is closely affiliated with its downstream customers.[45]

---

[44] *See*, *e.g.*, Commerce's Standard ME and NME AD Questionnaire at Fields: Credit Expense (CREDITH/U), Inventory Carrying Cost (INVCARH/U) and (DINVCARU).
[45] *See Remand Opinion and Order* at 17-18 (footnotes omitted).

Pursuant to the Court's *Order*, and for the purposes of this remand, we have now considered Customer A to be affiliated with each of its downstream customers. Specifically, we agree with the Court's analysis that the following facts indicate that Customer A and each of its downstream customers are affiliated:

> (1) Customer A and all but one of its downstream customers share the same mailing address, (2) the shared mailing address is the same mailing address associated with the CEO of Customer A ("CEO A"), (3) each downstream customer had the same CEO ("CEO B"), and (4) CEO B is listed as an employee of Customer A.[46]

While Commerce now finds that Customer A and its downstream customers are affiliated, after reexamining the information on the record within this framework, we find that the record does not contain sufficient evidence to determine whether Customer A made a profit on its resales, as explained below. Specifically, we find that Co May did not meet its burden in demonstrating that the merchandise was resold at a profit due to the manner of its disclosures regarding affiliation.

Section 751(a)(2)(B)(iv)(V) of the Act directs Commerce to consider "whether the subject merchandise involved in {the NSR} sales was resold in the United States at a profit."[47] Here, the record shows the price Customer A paid for the subject merchandise (the price from Co May to Customer A) and the price at which that customer sold the subject merchandise (the price from Customer A to affiliated downstream customers).[48] However, the record does not contain any information related to the resale of the subject merchandise to unaffiliated parties. In light of the Court's finding that Customer A was affiliated with its customers, and in recognition of the limited information on the record relating to this issue, we were unable to determine whether

---

[46] *Id*. at 16.
[47] *See* section 751(a)(2)(B)(iv) of the Act.
[48] *See Final Results* IDM at Comment 1.

Customer A (and its affiliated companies) made a profit when reselling that merchandise to downstream unaffiliated entities. Resale profitability is a crucial—and statutorily mandated—consideration when assessing the *bona fides* of a sale in the context of an NSR.

At the outset, we note that, in its initial request for a NSR, Co May did not disclose any potential affiliation between Customer A and its downstream customers.[49] Subsequently, in response to a supplemental questionnaire, Co May stated that Customer A was refusing to cooperate any further in this proceeding.[50] Later, however, in response to a supplemental questionnaire issued to Co May regarding resale profitability (which was due following the *Preliminary Results*), Co May's counsel stated that it was, in fact, able to obtain information from Customer A and provided a response.[51] Therein, neither Co May nor Customer A disclosed a potential affiliation between Customer A and its own customers.[52]

The end result of Co May's reporting is that the record did not contain complete evidence regarding any affiliation between Customer A and its downstream customers at any early stage in this proceeding. Co May's reporting did not permit Commerce to properly evaluate the role of affiliation in the analysis, and, given the timing of Customer A's participation, did not permit Commerce to potentially solicit information regarding resale profitability between *unaffiliated* parties (*i.e.*, the affiliated customers' downstream sales). Moreover, here, where there is only a single sale for Commerce to analyze, we must carefully scrutinize the facts surrounding the sale.

## C. Overall *Bona Fide* Analysis

The Court directed Commerce to further consider the treatment of cash deposits as

---

[49] *See* Co May's Letter, "Request for New Shipper Review – Co May Import Export Company Limited," dated February 13, 2023, at Exhibit 2.
[50] *See* Co May's Letter, "Supplemental Section D Questionnaire Response – Part 2 (Questions 1, 23, 53, 57)," dated August 11, 2023, at 1.
[51] *See* Co May's Letter, "Unaffiliated Customer Supplemental Questionnaire," dated February 8, 2024.
[52] *Id*. at Narrative, n.1

expenses and the impact of Customer A's affiliation with its customers on our analysis. Both factors affect Commerce's analysis under section 751(a)(2)(B)(iv)(V) of the Act of whether the merchandise was resold in the United States at a profit. Additionally, the significant risk borne by customers paying a cash deposit that they may never recover, depending on the outcome of the NSR, should be considered under the "any separate factor" factor of the *bona fide* sale analysis. However, it is important to recall that the Act does not call for independent analysis of each factor for its own sake—it requires Commerce to consider these factors to guide its ultimate decision of whether a sale is *bona fide*.[53] And as the Court noted, "{a} sale is not *bona fide* when it is 'commercially unreasonable' or 'atypical of normal business practices.'"[54] On remand, after further considering these issues, we find that the single sale from Co May to Customer A was commercially unreasonable, atypical of normal business practices, and therefore not a *bona fide* sale.

This determination is driven largely, but not exclusively, by considering the significant risk borne by Customer A by paying a sizeable cash deposit when ordering from Co May. Even if we do not treat the cash deposit itself as an expense, we do consider the associated commercial risk and the time value of money in our analysis. By purchasing from Co May rather than other suppliers (in Vietnam and elsewhere), Customer A both lost access to the value of the cash deposit and accepted a significant risk of never recovering that cash deposit if Co May does not receive its own rate or receives a high new shipper rate.

Although customers could make a commercially reasonable decision to take on significant risks in some circumstances, Customer A's decision to purchase from Co May in this

---

[53] *See* 751(a)(2)(B)(iv) of the Act.
[54] *See Remand Opinion and Order* at 8 (citing *Tianjin Tiancheng Pharmaceutical Co., Ltd. v. United States*, 366 F.Supp.2d 1246, 1249-50 (CIT 2005) (*Tianjin Tiancheng*)).

case was not commercially reasonable because Customer A did not receive benefits that would justify these risks and time value of money losses.  As noted in the original NSR and recognized by the Court, the sales price of this shipment "fell in the center of the distribution of the U.S. sales prices of the mandatory respondents."[55]  Moreover, nothing on the record indicates that Co May's products were of significantly higher quality or otherwise superior to other sources of supply.

This, in turn, raises the question:  If Customer A could buy the same product at the same price elsewhere, why would it take on added risk and cashflow expenses to buy from Co May?

A commercially reasonable transaction would have a clear answer to this question, but the transaction between Co May and Customer A does not.  If Co May were selling a higher quality product, selling at a lower price, filled demand that other suppliers could not meet, or otherwise provided some significant benefit to Customer A, the transaction may well be commercially reasonable. That does not appear to be the case here.  [



] The only explanation for why Customer A sought to do business with Co May instead of other suppliers is that Customer A [                                                    ].[56]  On its own, that is a valid explanation.  However, Customer A's actions show that explanation does not pass scrutiny. If the sale were commercially reasonable, and the customer truly did want to [

], then there would be no reason it would have limited its purchase from Co May to a single shipment.  [

---

[55] *See Final Results* IDM at Comment 1.
[56] *Id*.

     ] Neither Co May nor Customer A have provided any meaningful explanation for why they did not engage in additional transactions.

     Of course, one potential explanation could be that Customer A is waiting to see if Co May gets its own separate rate, and what that rate is.  [

     ]57  But this explanation creates multiple problems that require finding this sale not to be *bona fide*.  First, if this transaction were conducted simply to support a NSR that would result in a low or zero dumping margin for Co May, we would not be able to trust that the transaction would reflect normal commercial practices and likely future sales to the U.S. market, as the commercial incentive in a single transaction performed for the purpose of a NSR is to set the transaction price at a price that would result in a zero margin, rather than to buy at the lowest price the supplier would offer in the future.  This is particularly true when the new shipper accounts for a relatively small portion of subject merchandise and is therefore unlikely to be selected as a mandatory respondent in future reviews.  And this concern is only made worse by the fact that we cannot discern whether Customer A made a profit on its resales because neither party was forthcoming about the affiliation between Customer A and its affiliated customers early in the proceeding.  And, at a minimum, if the sale occurred solely for the purposes of a NSR, that sale is "atypical of normal business practices."

     Second, even if Commerce were to ignore the perverse incentives that exist in a

---

57 *Id.*

transaction that is conducted only for the purposes of an NSR, Co May and Customer A would still not be able to adequately explain why they only engaged in one single transaction. If the transaction were commercially reasonable, even with paying the cash deposit, then Co May and Customer A would have presumably continued to engage in additional transactions—particularly in light of Customer A's statement that [

]. But if the reason Customer A declined to continue purchasing from Co May is that it was concerned about the cash deposits—whether due to concerns about the time value of money or about the possibility that it would not recover those deposits—then that is implicitly an admission that the transaction was not commercially reasonable.

As the Court stated previously, if a sale is commercially unreasonable or atypical of normal business practices, it is not *bona fide*. Therefore, for the reasons stated above, we find that the single sale between Co May and Customer A was not *bona fide*.

## IV.    INTERESTED PARTY COMMENTS

As noted above, on August 28, 2025, the petitioners submitted comments on the Draft Results.[58] We summarize these comments below. As noted above, Commerce has revised its analysis on remand; we agree with the petitioners and, accordingly, the petitioners' comments are addressed by the discussion above.

**Comment 1:  Record Information Related to Resale Profitability and Affiliation**

*Petitioners Comments*[59]

> Commerce's Draft Results do not fully or adequately address the Court's instruction to consider the affiliation between Customer A and its downstream customers in the resale profitability analysis. Commerce acknowledges that relevant information is missing from the record, preventing it from determining whether the lone Co May sale was resold at a profit to an unaffiliated producer in the United States. Commerce's "neutral" conclusion with respect to resale

---

[58] *See* Petitioners Comments.
[59] *Id*. at 3-8 (citations omitted).

profitability is neither adequately explained nor supported, and out of step with past practice and judicial precedent. Commerce should therefore revise its draft remand results to explain that record evidence does not demonstrate that Co May's sale was resold at a profit and that the sale is therefore non-*bona fide*.

Under the Act, Commerce "shall consider" in a new shipper review, "whether the subject merchandise involved in such sales was resold in the United States at a profit," and the Court instructed Commerce to decide how resale profitability should be determined between closely affiliated parties. Instead of complying, Commerce speculated that Customer A and its affiliates "could be able to" achieve profitable resales to unaffiliated parties based on (1) Co May's sales price to Customer A, (2) Customer A's sales price to its affiliated, downstream customers, and (3) the expenses associated with Customer A's sales. However, none of these bases supports Commerce's speculation and, the Court did not believe that Co May having sold its goods at a typical price point was evidence, in itself, that Customer A and its affiliates made a profit on resale.

In new shipper reviews that are premised on a single sale, Commerce will "carefully scrutinize {the sale} to ensure that new shippers do not unfairly benefit from unrepresentative sales." The remand results flip this standard on its head, assuming that the downstream sales "could be" profitable in the absence of available evidence. Such a standard exposes the NSR process to abuse because importers can simply report profitable affiliated transactions to mask the affiliates' unprofitable resale. Indeed, Customer A submitted a letter in support of Co May's NSR, suggesting some level of coordination.

Commerce's decision to ignore the unaffiliated resale price is particularly egregious given that Co May and Customer A are responsible for the missing information. Co May provided an affidavit where Customer A incorrectly claimed that it was unaffiliated with its customers, and in a subsequent submission Customer A gave no indication that its sales were to affiliated customers (providing instead incomplete and misleading information about affiliated resales). Commerce should not reward Co May and Customer A for providing incomplete information.

**Commerce Position:** In light of the comments received, we have reconsidered our assessment of the record and, in particular, the timing/completeness of Co May's reporting regarding Customer A's relationship with its customers (and the impact this would have on our resale profitability analysis). In light of this revised analysis, we have also revised our finding that Co May's single sale was *bona fide*.

As noted above, the record does not contain any information related to any further resale

of the subject merchandise to unaffiliated customers (*i.e.*, sales prices and expenses/costs of Customer A's customers), and we were (and continue to be) unable to determine whether the group of downstream companies, as a whole, made a profit. This is a relevant consideration when assessing this factor as part of our overall *bona fides* analysis, and we find that the limited information on the record (combined with the late disclosure of Customer A's willingness to cooperate) reflects a failure of Co May to meet its burden to demonstrate the *bona fide* nature of its sale.

In light of the totality of the circumstances surrounding Co May's single sale of subject merchandise during the POR, we find that the sale underlying this NSR was not made on a *bona fide* basis. As the Court noted in *Huzhou Muyun Wood Co.*, "by definition, totality of the circumstances analyses are specific to particular cases, and the impact of various factors in determining whether a transaction is *bona fide* may vary depending on the circumstances of the transaction."[60] Moreover, we agree with the petitioners that it is appropriate to "carefully scrutinize {the single sale} to ensure that new shippers do not unfairly benefit from unrepresentative sales,"[61] especially where, as here, the respondent made only a single export during the POR. Accordingly, we find that the sale underlying this NSR was not made on a *bona fide* basis.

**Comment 2:  Treatment of AD Duty Deposits**

*Petitioners Comments*[62]

Commerce's treatment of AD duty deposits is both out of keeping with the practice it cites as support for that treatment and makes no logical sense.

Commerce's conclusion that -- because these deposits were ultimately

---

[60] *See Huzhou Muyun Wood Co. v. United States*, 324 F.Supp.3d 1364 (CIT 2018), as amended (July 27, 2018) (*Huzhou Muyun Wood Co.*).
[61] *See* Petitioners Comments at 6 (citing *Tianjin Tiancheng*, 366 F.Supp.2d at 1263).
[62] *See* Petitioners Comments at 8-10.

refundable, they could not impact the importer's resale profit, ignores commercial reality at the time the relevant sale, and resales -- were made. AD cash deposits are an expense – a financial outlay that the importer must bear -- with only an uncertain expectation of potential future return which importers must manage when deciding what price is necessary to generate a profit upon resale. Further, any refund of duties would occur long after the pricing decision is made, and, thus, Commerce should take them into account in assessing whether the importer made a profit on resale. When accounting for such deposits as an expense, the record does not demonstrate that the merchandise was resold at a profit.

The remand results also fail to consider the likelihood that Customer A would expect that it would ultimately receive a lower rate, brushing off any consideration of that likelihood as "speculation." It is equally speculative to assume that Customer A could safely presume that its deposits would be refunded. Customer A was clearly aware that it might ultimately lose its deposits, given that it advertises extensive experience {BPI removed}. Further, Customer A admitted that it purchased this lone sale from Co May {BPI removed}, which depended solely on {BPI removed}. This shows that the sale was a non-commercial attempt to {BPI removed} Co May before Commerce.

**Commerce Position:** In its opinion, the Court directed Commerce to "explain whether it considers the likelihood that {Customer A} would expect that its actual rate would be lower {than the cash deposits of AD duties}" or "{if Commerce performs no such particularized analysis, it should explain why." As discussed in detail above, we have complied with the Court's instructions.

Commerce does not include the cost of dumping duties in its margin analysis, and this practice has been clearly and repeatedly upheld at the Federal Circuit. In *Borusan*, the Federal Circuit held that "{a}ntidumping duties *cannot* be subtracted in the calculation of dumping margins (and hence antidumping duties), because doing so would produce a spiraling circularity,"[63] and, in *Apex*, the Federal Circuit held that "Commerce's refusal to deduct antidumping duties when calculating {export price} reflects a permissible construction"[64] of the

---

[63] See *Borusan*, 63 F.4th at 35 (emphasis added).
[64] See *Apex*, 777 F.3d at 1380.

Act.

Here, we agree with the petitioners that—unlike in the context of a margin calculation—cash deposits are a financial outlay, and it is both reasonable and appropriate to consider the uncertainty of the return of those deposits when assessing the commercial reasonableness of the sale at the time of importation. Thus, this is distinct from our treatment of AD cash deposits/duties in the context of a margin analysis.

Regarding an importer's expectations regarding the refund of all or some of its cash deposit, as noted above, we find that it would be impossible for Co May's customer to precisely ascertain what portion of a deposit it may recoup. Nonetheless, given the substantial deposit here, and the intrinsic uncertainty of the outcome of an NSR, there is a risk associated with Customer A's purchase from Co May (in addition to the cost of funding the deposit in the first instance). For these reasons, we find the approach set forth above to be appropriate. These considerations further support a finding that Co May did not establish that its U.S sale was *bona fide*.

## V.    FINAL RESULTS OF REDETERMINATION

Pursuant to the Court's *Remand Opinion and Order*, and in light of the record evidence, Commerce has provided additional discussion regarding: (1) its treatment of AD cash deposits in determining resale profitability under the circumstances of this case; and (2) Co May's reporting regarding the relationship between Customer A and its downstream customers as part of its resale profitability analysis. As described above, we have revisited our finding that Co May's single sale was *bona fide* and, instead, now find that its sale was not *bona fide*. If this

20

finding is affirmed, Commerce will rescind this new shipper review.

11/17/2025

X _Chris J Abbott_

Signed by: CHRISTOPHER ABBOTT

Christopher Abbott,
Deputy Assistant Secretary
 for Policy and Negotiations,
 performing the non-exclusive functions and duties
 of the Assistant Secretary for Enforcement and Compliance.